## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAINT ALPHONSUS HOME HEALTH AND
HOSPICE, LLC,
9199 West Black Eagle Drive
Boise, ID 83709

                           Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES,
200 Independence Ave., S.W.
Washington, D.C. 20201

and

TOM PRICE,
Secretary of the United States Department of
Health & Human Services,

U.S. Department of Health & Human Services
200 Independence Ave., S.W.
Washington, D.C. 20201

and

SEEMA VERMA,

Administrator of the Centers for Medicare &
Medicaid Services,
Center for Medicare & Medicaid Services
7500 Security Boulevard.
Baltimore, MD 21244

                           Defendants.

Case:

**EXPEDITED
CONSIDERATION REQUESTED**


**PRELIMINARY RELIEF (TRO)
SOUGHT BY APRIL 3, 2017**


**COMPLAINT**

## COMPLAINT

1.      Saint Alphonsus Home Health and Hospice, LLC ("SA-HHH") brings this action to obtain a temporary restraining order ("TRO") and preliminary and permanent injunctions staying termination of its Medicare provider agreement pending an administrative hearing.

2.      Defendants Department of Health and Human Services ("HHS"), Tom Price (the HHS Secretary) and Seema Verma (the administrator of the Centers for Medicare and Medicaid Services ("CMS") and, collectively, "Defendants" or the "government"), unlawfully purport to terminate SA-HHH's agreement with CMS on the basis of a fatally-flawed Medicare recertification survey, consisting of substantially false or misleading findings. This survey was supervised by Dennis Kelly, a hopelessly-conflicted and biased nurse and recently-terminated former employee of SA-HHH.   A third-party expert has reviewed the stated bases for termination and fully agrees that the termination notice is improper because there do not appear to be any deficiencies of the severity level meriting termination.

3.      Following his termination from SA-HHH, Mr. Kelly was hired by the Idaho Department of Health and Welfare's ("Idaho DOH") Division of Licensure Standards, Bureau of Facility Standards, as a surveyor.  He was subsequently promoted to survey supervisor. Upon information and belief, his duties and responsibilities as supervisor included supervision of Medicare certification and recertification surveys for home health agencies, among other non-long term care providers.  In this position, Mr. Kelly supervised the survey of SA-HHH; CMS, in turn, relied on Mr. Kelly's judgments and determinations to conclude that SA-HHH did not adhere to Medicare requirements, thereby justifying termination.

4.      Before Idaho DOH hired Mr. Kelly, he worked at the very agency he is now causing to be terminated.  Mr. Kelly's position as the Hospice Supervisor at SA-HHH was

1

abruptly eliminated following a due diligence review of matters that fell under his purview of responsibility and supervision.  In addition to the above irreconcilable conflict, Mr. Kelly formerly worked for, and currently has immediate family ties and benefits financially from, the principal competitive rival to SA-HHH in Boise, Idaho.  Mr. Kelly thus has a personal and financial interest in seeing SA-HHH fail.  Stated simply, Mr. Kelly is hopelessly conflicted and judgments and conclusions drawn by him should not and cannot form the basis of a determination to terminate SA-HHH from participation in the Medicare program.

5.      Significant issues regarding the Idaho DOH's survey of SA-HHH were brought to the attention of its Director, Richard Armstrong.  Upon information and belief, Director Armstrong attempted to recall the survey from CMS for further review by the Idaho DOH.  As the termination is still scheduled for April 3, 2017, CMS appears to have declined the Director's request to return the survey to the State prior to issuing its termination notice.

6.      Defendants' reliance on Dennis Kelly's specious findings as the basis for terminating SA-HHH deprived SA-HHH of property without due process.  Here, the process by which CMS purported to deprive SA-HHH of its property is both procedurally and substantively flawed and created an intolerably high risk of error.  The additional procedural safeguard of permitting an Administrative Law Judge ("ALJ") to adjudicate SA-HHH's termination—before it goes into effect—would remedy the procedural failing of CMS's reliance on Dennis Kelly's "findings."

7.      Preliminary relief is appropriate because SA-HHH's business will be destroyed if its termination from Medicare—based on findings that were clearly erroneous and contrary to Medicare guidelines—is permitted to go into effect.  In addition, SA-HHH will likely prevail on the merits of its constitutional claim that Defendants' reliance on Dennis Kelly's specious

2

findings as the basis for terminating SA-HHH deprived SA-HHH of property without due process.  In addition, the equities and the public interest favor SA-HHH.  The public has an interest in ensuring that the Medicare system is implemented and supervised with integrity, not, as here, in violation of a home health agency's due process rights.  It is the government—not SA-HHH—that has breached its obligations of fairness and service to the public in improperly and unconstitutionally attempting to terminate SA-HHH.

## PARTIES

8.      SA-HHH is a home health and hospice provider that has served the Boise and Treasure Valley, Idaho areas since 1978.  At any given time, SA-HHH typically serves approximately 200 home-health patients (patients recovering at home after a debilitating illness, surgery or hospitalization) and 10 to 30 hospice patients (patients with life-limiting illnesses).  SA-HHH is a Medicare-certified provider of these services, meaning that the Medicare program reimburses SA-HHH for qualifying patients.  SA-HHH s routinely receives exemplary patient satisfaction scores.  In 2014, SA-HHH was ranked in the top 25% of Medicare-certified home-health providers, based on an analysis of publicly-available performance measures in quality outcomes, process measure implementation, patient experience, quality improvement, and financial performance. SA-HHH employs approximately 65 clinicians and administrative staff.  It is a limited liability company chartered under the laws of Delaware.

9.      Defendant Department of Health and Human Services ("HHS") is an agency of the United States government.

10.     Defendant Tom Price, sued in his official capacity only, is Secretary of HHS.  As Secretary, he is responsible for administering the Social Security Act, 42 U.S.C. §§ 301, et seq., and in particular the Medicare Act, 42 U.S.C. §§ 1395, et seq.

3

11.     Defendant Seema Verma, sued in her official capacity only, is the administrator of the Centers for Medicare and Medicaid Services ("CMS").

12.     Secretary Price has delegated to Administrator Verma substantial responsibilities for administering the Medicare Act.

## JURISDICTION AND VENUE

13.     This action arises under the Social Security Act, 42 U.S.C. §§ 301, *et seq.*, the Medicare Act, 42 U.S.C. §§ 1395, *et seq.*, and the Fifth Amendment to the United States Constitution.

14.     This Court has jurisdiction under 28 U.S.C. § 1331.  Because this action is a purely collateral challenge to the administrative process—namely, it is an as-applied constitutional challenge to the deprivation of property in the absence of due process—this Court has jurisdiction to proceed without requiring exhaustion under 42 U.S.C. § 405(g) and (h) and 42 U.S.C. § 1395ii.  *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

15.     Venue is proper under 28 U.S.C. § 1391(b) and (e) and 5 U.S.C. § 703.

## STATUTORY AND REGULATORY BACKGROUND

16.     Medicare is a federal program that, among other things, pays for home health services furnished by qualified home health providers (known as home health "agencies") to qualifying beneficiaries.  *See* 42 U.S.C. §§ 1395f(a)(2)(C) and 1395n(a)(2)(A).

17.     These home health services include part-time or intermittent skilled nursing services, physical therapy, occupational therapy, speech-language pathology services, part-time or intermittent home health aide services, medical social services, and medical supplies and durable medical equipment. 42 U.S.C. § 1395x(m).

4

18.     In addition to setting forth the qualifications for a Medicare-covered beneficiary, *see* 42 U.S.C. §§ 1395f(a)(2)(C) and 1395n(a)(2)(A), the Medicare Act describes the prerequisites for a home health agency to participate in the Medicare program. *See* 42 U.S.C.A. § 1395bbb(a). The home health agency must have a state license, or otherwise meet the state licensure standards, 42 C.F.R. § 484.12(a), and also meet a variety of substantive conditions of participation pertaining to the provision of medical services. *See* 42 C.F.R. §§ 484.10-484.55.

19.     The Medicare Act authorizes HHS to contract with states for purposes of determining whether a home health agency meets the conditions of participation in the Medicare program. 42 U.S.C. § 1395aa(a); *see also* 42 U.S.C. § 1395z; 42 C.F.R. § 488.10.

20.     Where HHS has contracted with a state, the state is empowered to survey the home health agency for compliance with the Medicare conditions of participation. 42 C.F.R. § 488.11. The surveys are unannounced, 42 C.F.R. § 488.725(a), and must occur at least every three years, 42 C.F.R. § 488.730(a). The person conducting the survey must meet minimum professional qualifications prescribed by CMS, 42 C.F.R. § 488.735(a), but is automatically disqualified from acting as a surveyor if, within the last two years, he or she was employed by the home health agency being surveyed, 42 C.F.R. § 488.735(b). A surveyor is also disqualified if the "surveyor has a financial interest or an ownership interest in the HHA to be surveyed" or the "surveyor has a family member who has a relationship with the HHA to be surveyed" Id.

21.     In addition, "CMS and the States must consider all relevant circumstances that may exist beyond the [two-year] benchmark . . . to ensure that the integrity of the survey process is preserved. . . . For example, a surveyor may not have worked for the agency to be surveyed for more than two years, but may have left the HHA under unpleasant circumstances."

CMS State Operations Manual, Chapter 10, Survey and Enforcement Process for Home Health

Agencies, Section 10005.3[1]  In such case, the surveyor has a disqualifying conflict of interest.

      22.     The state surveyor must document his or her findings of non-compliance or

compliance, including any compliance that will be effective subject to the home health agency's

adherence to a plan of correction.  42 C.F.R. § 488.18.  In all cases of non-compliance, the home

health agency must submit a plan of correction, which sets forth the agency's plan to remedy any

asserted non-compliance with the Medicare program.  42 C.F.R. § 488.810(e). If the plan of

correction is unacceptable, or if the agency fails to adhere to its plan of correction, CMS may

impose sanctions on the agency, including civil monetary penalties and termination of the agency

from the Medicare program. *See* 42 C.F.R. § 488.865(b).

## FACTS

### Dennis Kelly, The Supervisor of the Surveys Resulting in SA-HHH's Termination, Was Formerly Employed By SA-HHH But His Employment Was Abruptly Terminated

      23.     SA-HHH was founded in 1978 by its co-owner Saint Alphonsus Regional

Medical Center (the "Hospital") to provide home health and hospice services to residents of the

Boise and Treasure Valley, Idaho areas.  In continuous operation for nearly 40 years, SA-HHH

has professionally, expertly and compassionately served and treated thousands of patients.

      24.     SA-HHH treats two types of patients: home health patients and hospice patients.

Home health patients are typically persons who are confined to their homes and in need of

intermittent nursing care or physical, speech, or continuing occupational therapy.  Hospice

patients are persons who are terminally ill (*i.e.*, with a life of expectancy of 180 days or less) and

---

[1] Available at: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c10.pdf.

who require palliative care to ease pain.  Historically, as well as in recent years, far more of SA-HHH's patients are home health patients than hospice patients.

      25.     As of March 2014, SA-HHH had two owners: the Hospital, a member of a well-established, non-profit regional health system; and Amedisys Idaho, L.L.C. ("Amedisys"), which formerly managed SA-HHH.

      26.     In April 2014, Amedisys sold its interest in SA-HHH to Frontier Home Health and Hospice, LLC ("Frontier"), a regional home health and hospice manager that operates eleven other agencies in six western states. Frontier is a seasoned owner and manager of home health agencies and hospices with deep experience in the industry.

      27.     After it assumed management of SA-HHH, Frontier conducted due diligence into the SA-HHH's operations and management, including interviews with staff and  review of billing and medical-certification records, and immediately became concerned with the performance of the Hospice Supervisor, Dennis Kelly.  At the conclusion of the due diligence investigation, Dennis Kelly's position was eliminated.  His termination was effective June 24, 2014.

### The Idaho DOH Hires Dennis Kelly As A Facility Surveyor

      28.     In May 2015, Mr. Kelly was hired by the Idaho DOH as a Facilities Surveyor for the State.  As such, Mr. Kelly had responsibility for carrying out Medicare surveys—that is, to actually examine the home health agency's compliance with applicable standards—upon which CMS relies in recertifying home health agencies.

      29.     In July 2015, just one year after Dennis Kelly's termination from SA-HHH, Idaho DOH initiated a recertification survey and a "complaint survey" of SA-HHH's hospice.  A complaint survey is an inquiry based on complaints provided by members of the public or a

Medicare provider's staff. The July 2015 complaint survey was based on four complaints that focused on administrative matters that could only have originated from a SA-HHH employee—or former employee—with administrative responsibilities. Dennis Kelly was of course responsible for administrative matters when he was the Hospice Supervisor.

30.     The July 2015 Idaho DOH survey team included Dennis Kelly. When SA-HHH alerted the survey team leader that Dennis Kelly had recently been terminated from the agency he was charged with surveying and that certain matters to be addressed fell under his supervision when he was an employee, the Idaho DOH properly disqualified him from participating in the survey. *See* 42 C.F.R. § 488.735(b). The disqualification avoided both an actual conflict and the appearance of conflict. The resulting surveys were carried out, and the deficiencies were quickly corrected to Idaho DOH's satisfaction.

31.     Approximately, one year later, on September 26, 2016, Idaho DOH initiated a routine Medicare recertification survey of SA-HHH. Although SA-HHH was unaware of it at the time, Dennis Kelly was the supervisor of the survey team. Although Mr. Kelly was not automatically disqualified by the two-year bar—it had been 27 months since Dennis Kelly had been terminated from SA-HHH—he should have been disqualified under Medicare rules which are very sensitive to conflicts of interest and recognize that terminations under unpleasant circumstances may be the basis for a longer ban. Moreover, Dennis Kelly's participation as the survey supervisor was inappropriate because he has both familial and financial interests in Horizon Home Health and Hospice ("Horizon"), a direct competitor of SA-HHH in Boise, Idaho. Horizon is a subsidiary of Cornerstone Healthcare, Inc. ("Cornerstone"), which in turn is a subsidiary of The Ensign Group, Inc. ("Ensign").

32.     The Horizon connection is multifaceted.  Dennis Kelly served as an Administrator at Horizon from November 2010 through June 2013.  During this period he was also in the Hospice and Hospice and Palliative Care Resource group within Cornerstone, Horizon's parent.  Mr. Kelly's wife, Sheryl Kelly, is a nurse-practitioner who currently works for Horizon; his son-in-law, Derrel V. Walker, M.D., who is married to Mr. Kelly's step-daughter, is the Associate Medical Director of Horizon; and Derrel's brother, Daniel H. Walker, is the President and CEO of Cornerstone and was previously the Assistant Secretary and Deputy General Counsel for Ensign.[2]

33.     There have been other connections between Mr. Kelly and Horizon as well.  Finding Home Foundation, Inc. ("Finding Home") is a tax-exempt organization supported by Horizon and Cornerstone.  Finding Home's Articles of Incorporation, filed November 7, 2011, lists Mr. Kelly as its Executive Director/President and a member of its Board of Directors.  According to his LinkedIn profile, Mr. Kelly was the Executive Director/President of Finding Home from December 2011 until June 2013.  Its website lists Mr. Kelly's son-in-law, Derrel Walker, as its Interim President/CEO and Chief Medical Officer, and Daniel Walker as its secretary.  Its December 19, 2016 filing with the Idaho Secretary of the State lists Elliot B. McMillan as the secretary, and Derrel Walker as a director. Elliot B. McMillan is also Finding Home's registered agent.  Mr. McMillan is the Associate General Counsel of Cornerstone

---

[2] Despite Mr. Kelly's status as a former Horizon employee and the existing direct ties of Mr. Kelly's family members to Horizon, survey letters referencing or signed by Mr. Kelly demonstrate that he was recently involved in Idaho DOH surveys of Horizon. Mr. Kelly's surveying of Horizon directly violated CMS conflict rules, which require disqualification from the survey of an agency in which the surveyor has a financial interest or an ownership interest in the HHA to be surveyed, or in which the surveyor has a family member who has a relationship with the HHA to be surveyed.. 42 C.F.R. § 488.735(b)(2) and (3).

Service Center in Eagle, Idaho, a Cornerstone/Horizon affiliate.  Mr. Kelly's YouTube account

currently includes a marketing video for Finding Home, featuring Derrel Walker standing in

front of a large Horizon Home Health & Hospice poster.  Perhaps most troubling is another

video on Mr. Kelly's YouTube account which is currently online despite Mr. Kelly's public

employee status that depicts Mr. Kelly speaking in favor of the Horizon-linked foundation's

initiative and wearing a Horizon-branded shirt.

34.     Notwithstanding the myriad conflicts, the survey proceeded under Dennis Kelly's

supervision and was completed on October 3, 2016. At the exit conference, the line surveyors

(essentially, the fact finders who reported to Dennis Kelly) were complimentary of the care

provided by SA-HHH, but said that the ultimate decision about whether to find deficiencies and

the severity of any deficiencies was up to their supervisor, Dennis Kelly.  Medicare guidelines

require the survey team's supervisor, in this case Dennis Kelly, to be involved in that ultimate

decision.  See CMS State Operations Manual, Chapter 2, Section 2724C3.

35.     On October 17, 2016, Dennis Kelly issued his report of the survey findings.  His

report alleged that SA-HHH was out of compliance with three condition-level requirements (*i.e.*,

requirements of an agency to participate in the Medicare program):  organization/administration;

acceptance of patients/plan of care/medical administration; and skilled nursing services.  In a

survey, deficiencies are assigned a level, based on severity and other objective and subjective

factors.  The most severe type of deficiency—a "condition-level" deficiency—is a deficiency

that "substantially limit[s] the provider's . . . capacity to furnish adequate care or which

---

[3] Available at https://www.cms.gov/Regulations-and-
Guidance/Guidance/Manuals/Downloads/som107c02.pdf.

adversely affect[s] the health and safety of patients." 42 C.F.R. § 488.24(b); 42 C.F.R. § 488.705. All other deficiencies are "standard-level" deficiencies, and cannot be the basis for a termination. Thus, in deeming SA-HHH's deficiencies condition-level—as opposed to standard level—Mr. Kelly was not only making (erroneous) factual determinations, but also weighing whether the deficiencies "substantially limit" SA-HHH's performance as a home health agency.4

36.    The vast majority of the supporting findings in Mr. Kelly's report were demonstrably inaccurate, highly repetitive, and focused on technical documentation issues. There were no allegations that any patient ever experienced harm as a result of any alleged deficiency and no allegation that the deficiencies posed immediate jeopardy to patients.5  SA-HHH took the survey findings seriously, filed a plan of correction and proceeded to implement the plan. On December 6, 2016, the surveyors returned to assess whether SA-HHH had corrected the alleged deficiencies.

37.    On December 9, 2016, SA-HHH received a letter from Julius Bunch, Manager of CMS's Seattle Regional Office Division of Certification and Enforcement. The letter notified SA-HHH that, based on the survey results, CMS was imposing a $10,000 per day civil monetary penalty, retroactive to September 26, 2016 and continuing until such time as SA-HHH regained substantial compliance with the condition-level requirements. This was an extraordinary penalty. The total amount of the penalty, calculated through April 3, 2017 (the effective date of SA-HHH's termination), will be $1,820,000. CMS imposed a total of $2.2 million of penalties on

---

[4] The report did not allege that SA-HHH's practices caused any actual patient harm, i.e., Mr. Kelly did not assert that the alleged deficiencies had an actual "adverse[ ] affect [on] the health and safety of patients." 42 C.F.R. § 488.24(b).

[5] Immediate jeopardy means a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause serious injury, harm, impairment, or death to a patient(s).  42 C.F.R. § 488.805.

twenty-nine different agencies in all of 2016.[6]  This outrageous sanction was in all likelihood recommended to CMS by Dennis Kelly.[7]

38.     On December 13, 2016, Dennis Kelly wrote a letter to SA-HHH stating that two of the three originally-cited condition-level deficiencies (acceptance of patients/plan of care/medical administration and skilled nursing services) had not been corrected.  As in his previous report, Mr. Kelly's December 13 report was based on findings that were demonstrably inaccurate, highly repetitive and focused on technical documentation issues with no allegation whatsoever that any patient experienced harm.  Again, no immediate jeopardy findings were made.

39.     In light of the gravity of the December 9 and December 13 communications, SA-HHH now marshaled all available resources to develop a plan of correction, submitted on December 28, 2016, and to implement that plan.  Frontier sent its key management team to Boise, and also retained The Corridor Group (a home health and hospice consulting firm headquartered in Overland Park, Kansas) ("Corridor") to assist in the correction effort.  Corridor

---

[6] Home Health Line, *Civil Monetary Penalties, Immediate Jeopardy Situations Drop For Agencies In 2016*, available at:
http://homehealthline.decisionhealth.com/Articles/Detail.aspx?id=523880

[7] *See* CMS State Operations Manual, Chapter 10, Survey and Enforcement Process for Home Health Agencies, 10000.1 ("Alternative sanctions are recommended by the SA [state agency] and the CMS RO [regional office] reviews the recommendation to ensure that it is supported by the SA findings."); 10010.2 - General Provisions ("Survey agencies should make a recommendation to the RO on which sanction(s) may be effective in prompting the HHA to return to compliance. The RO considers the SA's recommendations and makes a determination to agree with or impose a different sanction(s) for the HHA.")

staffed the correction effort with an experienced interim agency administrator and a compliance nurse who specializes in survey recovery. In addition, SA-HHH retained another contractor to assist with field observation visits and staff training.

40.    At Corridor's recommendation, SA-HHH limited nursing admissions to give the agency's nurses sufficient time to fully participate in the educational and training aspects of the plan of correction, including 1:1 education and field observation visits. (This limitation resulted in a decline of home health patients from about 210 to 147, and a commensurate loss in revenue.)

41.    On February 6, 2017, SA-HHH filed a 123-page appeal of CMS's $10,000-per-day civil monetary penalty, challenging every single alleged finding in the October 7, 2016 and December 13, 2016 survey reports. That appeal is currently pending before an Administrative Law Judge.

42.    On February 21, 2017, Idaho DOH surveyors returned to SA-HHH to assess its compliance with the plan of correction. The surveyors remained on-site for five days, clearly having been directed to not merely carry out a revisit to assess compliance with the plan of correction directed at the two pending deficiencies, but to conduct a full recertification survey, like the one initiated on September 26, 2016. Conducting a recertification survey in lieu of a revisit survey is highly unusual. The surveyors focused on new areas of inquiry rather than the prior survey findings that led to the condition-level deficiencies and the plans of correction.

43.    On February 27, 2017, the surveyors held an exit conference citing issues found during the survey. Again, in no case did they allege that any patient experienced harm as a result of these issues. SA-HHH expressed adamant disagreement with the findings. The surveyors told SA-HHH that it was permitted to submit additional information, within 48 hours, to contest the

13

findings.  On March 1, 2017, SA-HHH did just that, providing hundreds of pages of additional information and documentation refuting nearly all of the findings.

**Despite His Prior Employment by and Abrupt Dismissal by SA-HHH, and Despite His Prior Employment by and Familial Connections to SA-HHH's Direct Competitor, Dennis Kelly Exercises His Conflicted Judgment to Conclude That SA-HHH Is Not Medicare-Compliant.**

44.     On March 10, 2017, Dennis Kelly sent another letter and report to SA-HHH.  The report largely ignored the extensive information and documentation provided by SA-HHH to refute the alleged deficiencies, and cited the same three condition-level deficiencies as in his original letter of October 17, 2016.  There were no allegations that any patients were actually harmed.  There also was no allegation that the deficiencies posed immediate jeopardy to patients, which means that there was no finding that the deficiencies were likely to cause serious harm to any patients.  While SA-HHH disagreed with the findings in the October 17, 2016 and December 13, 2016 reports—many of which were demonstrably false—the misstatements in the March 10, 2017 report were particularly egregious in light of the refutations previously provided on March 1, which were based on SA-HHH's own investigation appear to have been ignored by Kelly. The March 10 report's many blatant factual inaccuracies strongly suggest that Mr. Kelly and the surveyors did not even bother to read the March 1 refutations.

45.     Indeed, SA-HHH's retained expert has evaluated the March 10 report and concluded that "the citation of these three condition level deficiencies [in the report] were not justified by the facts alleged and should not have been cited at all," and that "[t]here are no findings in the Report that rise to the level of a condition level deficiency." Declaration of Kathleen Peterson-Sgro, dated March 27, 2017, ¶¶ 11, 13.

46.     By way of illustrative example, the inaccuracies in the March 10 report included the following:

- The report alleged that SA-HHH delayed in its provision of nursing services to Patient #9.[8] However, **no nursing services had been ordered for Patient #9 and the patient's daughter, herself a nurse, signed a sworn affidavit attesting to that fact.**

- The report alleged that SA-HHH did not provide social work services to Patient #7 in a timely manner. However, **the physician order specifically states that the frequency for social work services was to be one visit within one month. SA-HHH's social worker visited Patient #7 within eight days of the order, clearly meeting the timing that the physician had ordered.**

- The report alleged that SA-HHH did not provide wound care as ordered for Patient #3. However, **there were supplemental orders in the patient's file that changed the original wound care orders. SA-HHH's clinicians provided care in accordance with the operative supplemental orders.**

- The report alleged that SA-HHH failed to include Patient #3's walker on his plan of care, but **the walker is referenced in the patient's plan of care.**

- The report alleged that Patient #8's plan of care failed to include her oxygen concentrator, but **Patient #8 did not use an oxygen concentrator.**

47.      The March 10 report also cited technical issues with SA-HHH's documentation,

but which posed no potential for patient harm.  For example:

- The report alleged that SA-HHH failed to include Patient #3's oxygen concentrator on his plan of care, but the patient's medication list stated that the patient was on oxygen via nasal cannula. Since the nasal cannula is the tubing delivery system that is used with the concentrator, **by listing the nasal cannula and the oxygen, it is clear that an oxygen concentrator was being used.**

- The report alleged that Patient #12's plan of care failed to list her nebulizer, but **the plan of care stated ipratroprium-albuterol "by nebulization route," making it clear that the patient was using a nebulizer.**

48.      Furthermore, one of the condition-level citations is clearly contrary to CMS

guidance.  The Idaho DOH found SA-HHH out of compliance with 42 CFR §484.14,

(Organization, Services, and Administration) but cited only one supporting "G tag" (an

---

[8] The report anonymized patients, and referred to them by number.  An addendum to the report identified the patients by name.

15

abbreviated identifier used by CMS to link deficiencies to regulatory requirements) to substantiate the condition-level finding. However, CMS guidance instructs surveyors to consider citation of 42 CFR §484.14 at the condition-level only when at least three supporting G tags are cited. DOH disregarded this guidance. Moreover, the Idaho DOH made overly general and unsubstantiated statements to justify even the single G tag that it cited. Instead of pointing to any specific noncompliant or deficient action or behavior, the Idaho DOH concluded that the agency's governing body failed to provide sufficient administrative oversight and management for the effective operation of the agency merely by virtue of the fact that the Idaho DOH determined that SA-HHH was out of compliance with the Medicare rules, which SA-HHH vigorously disputes. In other words, SA-HHH was deficient with respect to this condition solely because Idaho DOH asserted the other two deficiencies. This sort of ipso facto, Catch 22 reasoning is yet another example of the type of tortured logic that make up many of the findings and indicate a biased survey.

49.     SA-HHH made several attempts to communicate directly with CMS, to explain the gravity of the errors in the March 10 report, and to express its concerns with the manner in which the surveys were conducted. SA-HHH has yet to be provided an opportunity to be heard.

50.     On March 13, 2017, the Hospital's legal counsel, Kathleen Drummy, emailed Patrick Thrift, the CMS Executive Regional Manager, to request an opportunity to discuss the survey findings with CMS.

51.     On March 14, 2017, Karen W. Roe, RN, MHA, Nurse Consultant, Division of Survey, Certification & Enforcement, CMS, responded, stating that all correspondence should be directed to Aaron Brown, Assistant Regional Counsel, Office of the General Counsel, HHS, since an appeal (pertaining to the $10,000-per-day penalty) had already been filed by SA-HHH.

52.     On March 15, 2017, Ms. Drummy emailed Ms. Roe to clarify that the request for a conference call with CMS was not in regard to the civil monetary penalties that are pending appeal, but rather the request for a call was related to the March 10 findings.

53.     On March 16, 2017, SA-HHH's outside counsel, along with Ms. Drummy, called Mr. Brown and asked for an audience with CMS to explain the circumstances surrounding the surveys and, particularly, the issues with the March 10 findings.

54.     On March 17, 2017, SA-HHH's outside counsel and Ms. Drummy emailed Mr. Brown and Ms. Roe again requesting an opportunity to discuss the March 10 findings with CMS. Ms. Drummy also left a message for Mr. Chickering.  Mr. Brown responded that "opportunity to resolve the matter still exists" but did not provide a date or time certain where SA-HHH could communicate its concerns to CMS. Ms. Roe responded stating that she would discuss the matter with Mr. Bunch and get back in touch "early next week." Mr. Chickering never responded at all.

55.     Meanwhile on March 17, 2017, on the basis of the March 10 report, CMS informed SA-HHH that it was terminating SA-HHH's Medicare provider agreement, effective April 3, 2017.

56.     On March 21, 2017, Mr. Brown wrote SA-HHH's outside counsel and Ms. Drummy stating, "After reviewing the 2567 [March 10 report] and supporting information on file, CMS has decided to proceed with its termination action against SA-HHH."

57.     On March 22, 2017, SA-HHH's outside counsel and Ms. Drummy once again emailed Mr. Brown, requesting a phone call with CMS, but did not hear back. On March 24, 2017, SA-HHH's outside counsel wrote a letter to Mr. Bunch, explaining that CMS had refused to hear SA-HHH, and noting there were serious problems with the March 10 report and the fairness of the underlying survey, based on Mr. Kelly's bias.

17

58.     Later on March 24, 2017, SA-HHH appealed CMS's determination, and requested

an expedited pre-termination hearing before an ALJ. *See* 42 C.F.R. § 498.40.

59.     On March 27, 2017, Mr. Brown finally agreed to speak to SA-HHH's outside

counsel by telephone that afternoon.  On the call, SA-HHH's outside counsel provided further

details about Dennis Kelly's conflicts and requested an opportunity to demonstrate to CMS that

the survey findings were erroneous.  Mr. Brown did not indicate that such an opportunity would

be forthcoming.

60.     As of this writing, Idaho DOH has not provided notice of any Idaho licensing

violations based on the resurvey results and Idaho DOH indicated to SA-HHH that it is not

issuing any such findings or taking any action as to SA-HHH.

## PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED

61.     An immediate stay of SA-HHH's termination pending a hearing before an ALJ is

warranted because SA-HHH will suffer immediate, irreparable harm in the absence of an

injunction, SA-HHH is likely to succeed on the merits, and the balance of equities and the public

interest favor injunctive relief.

62.     Medicare payments comprise the vast majority of SA-HHH's revenue. If CMS's

termination is effective as of April 3, 2017, SA-HHH will go out of business within a matter of

weeks, well before SA-HHH's appeal before the ALJ is heard.  SA-HHH does not have

sufficient assets to keep it afloat for even one month. It is operating at a loss now, as a result of

having reduced its patient count to implement its plan of correction, and it is projected to operate

at an even greater loss if Medicare payments are taken away.

63.     In addition to the economic harm SA-HHH will suffer, its vulnerable patients will

be forced to adjust to new caregivers and its employees will become unemployed.

64.     Moreover, the reputational damage of losing its Medicare agreement—damage which has already begun, following a March 21, 2016 article in the *Idaho Statesman* describing the March 17, 2017 notice from CMS[9]—would further contribute to the destruction of SA-HHH's business, as doctors and private insurers will cease to refer even non-Medicare patients to a home health agency stigmatized by having been terminated from Medicare.

65.     SA-HHH will likely succeed on the merits. SA-HHH's Medicare agreement is a property right within the meaning of the Fifth Amendment to the United States Constitution. As such, SA-HHH is entitled to due process before that property is taken away.

66.     The process by which CMS has purported to deprive SA-HHH of its property—by relying on findings made by Mr. Kelly, a biased, conflicted, decision-maker—runs an intolerably high risk of error and is of essentially zero value to adjudicating SA-HHH's right to continue as a Medicare provider. The additional procedural safeguard of having an ALJ adjudicate SA-HHH's rights—before they are taken away—would remedy the procedural failing of CMS's reliance on Mr. Kelly's "findings."

67.     The government will incur no additional costs if SA-HHH's termination is stayed pending a hearing before an ALJ. The Medicare payments that the government will make to SA-HHH while the hearing is pending are payments that the government would make anyway, to whatever home health agency would serve SA-HHH's patients if SA-HHH were terminated. A stay of the termination would not cause the government to outlay any additional monies.

68.     Moreover, there is no administrative burden to the government in affording SA-HHH a pre-deprivation hearing. *Any* terminated home health agency is entitled to a hearing

---

[9] Saint Alphonsus home health and hospice agency cited for 'systemic failures', http://www.idahostatesman.com/news/business/article139963643.html

19

Case 1:17-cv-00564-RC   Document 1   Filed 03/29/17   Page 21 of 23

before an ALJ. The only difference here is that SA-HHH's hearing would occur *before* it is terminated, to remedy the constitutionally flawed process that led to CMS's decision to terminate.

69.    The balance of equities and the public interest favor preliminary relief. The public has an interest in seeing to it that the Medicare system is implemented and supervised with integrity, not, as here, in violation of a home health agency's due process rights. SA-HHH has served its community for nearly 40 years. Contrary to the specious findings on which CMS based its termination decision, SA-HHH is in compliance with the requirements of the Medicare program. It is the government—not SA-HHH—that has breached its obligations of fairness and service to the public in improperly and unconstitutionally purporting to terminate SA-HHH.

## COUNT I: DUE PROCESS

70.    The allegations in the preceding paragraphs 1 through 69 are incorporated herein by reference as if fully set forth herein.

71.    CMS's decision to terminate SA-HHH on the basis of the judgment of a biased and conflicted decision-maker deprived SA-HHH of its right to due process before its property is taken.

72.    SA-HHH's interests in retaining its property is significant and deprivation without a hearing would threaten significant injury. Without its Medicare agreement, SA-HHH will be forced to shut down its home health business. Moreover, the reputational damage of losing its Medicare agreement would likely destroy SA-HHH's hospice business as well.

73.    The process by which CMS has purported to deprive SA-HHH of its property— by relying on findings made by Dennis Kelly—ran an intolerably high risk of error and was of essentially zero value to adjudicating SA-HHH's right to continue as a Medicare provider. The

20

additional procedural safeguard of having an ALJ adjudicate SA-HHH's rights would remedy the procedural failing of CMS's reliance on Mr. Kelly's "findings."

74.     The government will incur no additional costs if SA-HHH's termination is stayed pending a hearing before an ALJ.  The Medicare payments that the government will make to SA-HHH while the hearing is pending are payments that the government would make anyway, to whatever home health agency would serve SA-HHH's patients if SA-HHH were terminated.  A stay of the termination would not cause the government to outlay any additional monies, and it would not cause any harm to any of SA-HHH's patients who will continue to receive proper care.

75.     Moreover, there is no administrative burden to the government in affording SA-HHH a pre-deprivation hearing.  *Any* terminated home health agency is entitled to a hearing before an ALJ.  The only difference here is that SA-HHH's hearing would occur *before* it is terminated, to remedy the constitutionally flawed process that led to CMS's decision to terminate.

## PRAYER FOR RELIEF

WHEREFORE SA-HHH requests that this Court:

1) Issue a Temporary Restraining Order ("TRO") pursuant to Federal Rule of Civil Procedure 65(b) staying CMS's termination of SA-HHH from the Medicate home-health program, pending resolution of SA-HHH's appeal before an ALJ.

2) Order the Defendants to appear by March 31, 2017 to show cause why the TRO should not remain in effect as a preliminary injunction pending resolution of SA-HHH's appeal before an ALJ.

21

3) Enter a preliminary and permanent injunction staying CMS's termination of SA-HHH

   from the Medicare home-health program, pending resolution of SA-HHH's appeal before

   an ALJ; and

4) Provide such other relief as the Court deems just and proper.

Dated: March 29, 2017                              Respectfully submitted,

                                         By: _____

                                              David L. Hall
                                              D.C. Bar Number: 1033996
                                              Dana M. Stepnowsky
                                              D.C. Bar Number: 1004080
                                              WIGGIN AND DANA LLP
                                              1350 I Street, NW
                                              Washington, D.C. 20005
                                              202.800.2470
                                              dhall@wiggin.com

                                              James I. Glasser (*pro hac vice* pending)
                                              WIGGIN AND DANA LLP
                                              One Century Tower
                                              P.O. Box 1832
                                              New Haven, CT 06508-1832
                                              (203) 498-4400
                                              (203) 782-2889 (fax)
                                              jglasser@wiggin.com

                                              *Counsel for Saint Alphonsus*
                                              *Home Health and Hospice, LLC*