## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAINT ALPHONSUS HOME HEALTH AND
HOSPICE, LLC,

                          Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES,

and

TOM PRICE,
Secretary of the United States Department of
Health & Human Services,

and

SEEMA VERMA,
Administrator of the Centers for Medicare &
Medicaid Services,

                         Defendants.

Case:

**EXPEDITED
CONSIDERATION REQUESTED**

**PRELIMINARY RELIEF (TRO)
SOUGHT BY APRIL 3, 2017**

## PLAINTIFF'S MOTION FOR A TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Saint Alphonsus Home Health and Hospice, LLC ("SA-HHH") moves for a TRO and

preliminary injunction staying termination of its Medicare provider agreement pending an

administrative hearing, pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule

65.1.

As detailed in the accompanying Memorandum of Law and the Declarations of Bennett J.

Bernblum and Kathleen Peterson-Sgro, SA-HHH is entitled to an Order enjoining Defendants

Department of Health and Human Services ("HHS"), Tom Price (the HHS Secretary) and Seema

Verma (the administrator of the Centers for Medicare and Medicaid Services) from terminating

SA-HHH from the Medicare home-health program, pending resolution of SA-HHH's appeal before an Administrative Law Judge.  A proposed Order is annexed for the Court's consideration.

Undersigned counsel certifies, pursuant to Local Civil Rule 65.1, that it intends to notify Defendants through its counsel Aaron Brown (aaron.brown@hhs.gov) of this motion and to email counsel copies of all papers filed in this case, on March 29, 2017 at approximately 11:00 a.m.

SA-HHH respectfully requests a hearing on this motion on or before Friday March 31, 2017 inasmuch as preliminary relief is required on or before April 3, 2017, to prevent irreparable harm.

Dated: March 29, 2017

Respectfully submitted,

By: _____

David L. Hall
D.C. Bar Number: 1033996
Dana M. Stepnowsky
D.C. Bar Number: 1004080
WIGGIN AND DANA LLP
1350 I Street, NW
Washington, D.C. 20005
202.800.2470
dhall@wiggin.com

James I. Glasser (*pro hac vice* pending)
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jglasser@wiggin.com

*Counsel for Saint Alphonsus*
*Home Health and Hospice, LLC*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAINT ALPHONSUS HOME HEALTH AND
HOSPICE, LLC,

                    Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES,

and

TOM PRICE,

Secretary of the United States Department of
Health & Human Services,

and

SEEMA VERMA,

Administrator of the Centers for Medicare &
Medicaid Services,

                    Defendants.

Case:

**EXPEDITED
CONSIDERATION REQUESTED**

**PRELIMINARY RELIEF (TRO)
SOUGHT BY APRIL 3, 2017**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY REQUEST
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

Saint Alphonsus Home Health and Hospice, LLC ("SA-HHH") moves for a temporary restraining order ("TRO") and preliminary injunction staying termination of its Medicare provider agreement pending an administrative hearing.

Defendants Department of Health and Human Services ("HHS"), Tom Price (the HHS Secretary) and Seema Verma (the administrator of the Centers for Medicare and Medicaid Services ("CMS") and, collectively, "Defendants" or the "government"), unlawfully purport to terminate SA-HHH's agreement with CMS on the basis of a fatally-flawed Medicare recertification survey, consisting of substantially false or misleading findings. This survey was supervised by Dennis Kelly, a hopelessly-conflicted and biased nurse and recently-terminated former employee of SA-HHH. A third-party expert has reviewed the stated bases for termination and fully agrees that the termination notice is improper because there do not appear to be any deficiencies of the severity level meriting termination.

Following his termination from SA-HHH, Mr. Kelly was hired by the Idaho Department of Health and Welfare's ("Idaho DOH") Division of Licensure Standards, Bureau of Facility Standards, as a surveyor. He was subsequently promoted to survey supervisor. Upon information and belief, his duties and responsibilities as supervisor included supervision of Medicare certification and recertification surveys for home health agencies, among other non-long term care providers. In this position, Mr. Kelly supervised the survey of SA-HHH; CMS, in turn, relied on Mr. Kelly's judgments and determinations to conclude that SA-HHH did not adhere to Medicare requirements, thereby justifying termination.

Before Idaho DOH hired Mr. Kelly, he worked at the very agency he is now causing to be terminated. Mr. Kelly's position as the Hospice Supervisor at SA-HHH was abruptly

eliminated following a due diligence review of matters that fell under his purview of responsibility and supervision.   In addition to the above irreconcilable conflict, Mr. Kelly formerly worked for, and currently has immediate family ties and benefits financially from, the principal competitive rival to SA-HHH in Boise, Idaho.  Mr. Kelly thus has a personal and financial interest in seeing SA-HHH fail.  Stated simply, Mr. Kelly is hopelessly conflicted and judgments and conclusions drawn by him should not and cannot form the basis of a determination to terminate SA-HHH from participation in the Medicare program.

Significant issues regarding the Idaho DOH's survey of SA-HHH were brought to the attention of its Director, Richard Armstrong.  Upon information and belief, Director Armstrong attempted to recall the survey from CMS for further review by the Idaho DOH.  As the termination is still scheduled for April 3, 2017, CMS appears to have declined the Director's request to return the survey to the State prior to issuing its termination notice.

A TRO and preliminary injunction are appropriate because SA-HHH's business will be destroyed if its termination from Medicare—based on findings that were clearly erroneous and contrary to Medicare guidelines—is permitted to go into effect.  In addition, SA-HHH will likely prevail on the merits by demonstrating that Defendants' reliance on Dennis Kelly's specious findings as the basis for terminating SA-HHH deprived SA-HHH of property without due process.  Here, the process by which CMS purported to deprive SA-HHH of its property is both procedurally and substantively flawed and created an intolerably high risk of error.  The additional procedural safeguard of permitting an Administrative Law Judge ("ALJ") to adjudicate SA-HHH's termination—before it goes into effect—would remedy the procedural failing of CMS's reliance on Dennis Kelly's "findings."

2

The equities and the public interest favor SA-HHH.  The public has an interest in ensuring that the Medicare system is implemented and supervised with integrity, not, as here, in violation of a home health agency's due process rights.  It is the government—not SA-HHH—that has breached its obligations of fairness and service to the public in improperly and unconstitutionally attempting to terminate SA-HHH.

**STATUTORY AND REGULATORY BACKGROUND**

Medicare is a federal program that, among other things, pays for home health services furnished by qualified home health providers (known as home health "agencies") to qualifying beneficiaries.  *See* 42 U.S.C. §§ 1395f(a)(2)(C) and 1395n(a)(2)(A).

These home health services include part-time or intermittent skilled nursing services, physical therapy, occupational therapy, speech-language pathology services, part-time or intermittent home health aide services, medical social services, and medical supplies and durable medical equipment. 42 U.S.C. § 1395x(m).

In addition to setting forth the qualifications for a Medicare-covered beneficiary, *see* 42 U.S.C. §§ 1395f(a)(2)(C) and 1395n(a)(2)(A), the Medicare Act describes the prerequisites for a home health agency to participate in the Medicare program.  *See* 42 U.S.C.A. § 1395bbb(a).  The home health agency must have a state license, or otherwise meet the state licensure standards, 42 C.F.R. § 484.12(a), and also meet a variety of substantive conditions of participation pertaining to the provision of medical services.  *See* 42 C.F.R. §§ 484.10-484.55.

The Medicare Act authorizes HHS to contract with states for purposes of determining whether a home health agency meets the conditions of participation in the Medicare program. 42 U.S.C. § 1395aa(a); *see also* 42 U.S.C. § 1395z; 42 C.F.R. § 488.10.

Where HHS has contracted with a state, the state is empowered to survey the home health agency for compliance with the Medicare conditions of participation.   42 C.F.R. § 488.11.  The surveys are unannounced, 42 C.F.R. § 488.725(a), and must occur at least every three years, 42 C.F.R. § 488.730(a).  The person conducting the survey must meet minimum professional qualifications prescribed by CMS, 42 C.F.R. § 488.735(a), but is automatically disqualified from acting as a surveyor if, within the last two years, he or she was employed by the home health agency being surveyed, 42 C.F.R. § 488.735(b).  A surveyor is also disqualified if the "surveyor has a financial interest or an ownership interest in the HHA to be surveyed" or the "surveyor has a family member who has a relationship with the HHA to be surveyed" *Id.*

In addition, "CMS and the States must consider all relevant circumstances that may exist beyond the [two-year] benchmark . . . to ensure that the integrity of the survey process is preserved. . . . For example, a surveyor may not have worked for the agency to be surveyed for more than two years, but may have left the HHA under unpleasant circumstances." CMS State Operations Manual, Chapter 10, Survey and Enforcement Process for Home Health Agencies, Section 10005.3.[1]  In such case, the surveyor continues to have a disqualifying conflict of interest.

The state surveyor must document his or her findings of non-compliance or compliance, including any compliance that will be effective subject to the home health agency's adherence to a plan of correction.  42 C.F.R. § 488.18.  In all cases of non-compliance, the home health agency must submit a plan of correction, which sets forth the agency's plan to remedy any asserted non-compliance with the Medicare program.  42 C.F.R. § 488.810(e). If the plan of

---

[1] Available at: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c10.pdf.

correction is unacceptable, or if the agency fails to adhere to its plan of correction, CMS may

impose sanctions on the agency, including civil monetary penalties and termination of the agency

from the Medicare program. *See* 42 C.F.R. § 488.865(b).

## FACTS

**Dennis Kelly, The Supervisor of the Surveys Resulting in SA-HHH's Termination, Was
Formerly Employed By SA-HHH But His Employment Was Abruptly Terminated**

SA-HHH was founded in 1978 by its co-owner Saint Alphonsus Regional Medical Center

(the "Hospital") to provide home health and hospice services to residents of the Boise and

Treasure Valley, Idaho areas.  In continuous operation for nearly 40 years, SA-HHH has

professionally, expertly and compassionately served and treated thousands of patients.

SA-HHH treats two types of patients: home health patients and hospice patients.  Home

health patients are typically persons who are confined to their homes and in need of intermittent

nursing care or physical, speech, or continuing occupational therapy.  Hospice patients are

persons who are terminally ill (*i.e.*, with a life of expectancy of 180 days or less) and who require

palliative care to ease pain.  Historically, as well as in recent years, far more of SA-HHH's

patients are home health patients than hospice patients.

As of March 2014, SA-HHH had two owners: the Hospital, a member of a well-

established, non-profit regional health system; and Amedisys Idaho, L.L.C. ("Amedisys"), which

formerly managed SA-HHH.

In April 2014, Amedisys sold its interest in SA-HHH to Frontier Home Health and

Hospice, LLC ("Frontier"), a regional home health and hospice manager that operates eleven

other agencies in six western states. Frontier is a seasoned owner and manager of home health

agencies and hospices with deep experience in the industry.

After it assumed management of SA-HHH, Frontier conducted due diligence into the SA-HHH's operations and management, including interviews with staff and review of billing and medical-certification records, and immediately became concerned with the performance of the Hospice Supervisor, Dennis Kelly. At the conclusion of the due diligence investigation, Dennis Kelly's position was eliminated. His termination was effective June 24, 2014.

### The Idaho DOH Hires Dennis Kelly As A Facility Surveyor

In May 2015, Mr. Kelly was hired by the Idaho DOH as a Facilities Surveyor for the State. As such, Mr. Kelly had responsibility for carrying out Medicare surveys—that is, to actually examine the home health agency's compliance with applicable standards—upon which CMS relies in recertifying home health agencies.

In July 2015, just one year after Dennis Kelly's termination from SA-HHH, Idaho DOH initiated a recertification survey and a "complaint survey" of SA-HHH's hospice. A complaint survey is an inquiry based on complaints provided by members of the public or a Medicare provider's staff. The July 2015 complaint survey was based on four complaints that focused on administrative matters that could only have originated from a SA-HHH employee—or former employee—with administrative responsibilities. Dennis Kelly was of course responsible for administrative matters when he was the Hospice Supervisor.

The July 2015 Idaho DOH survey team included Dennis Kelly. When SA-HHH alerted the survey team leader that Dennis Kelly had recently been terminated from the agency he was charged with surveying and that certain matters to be addressed fell under his supervision when he was an employee, the Idaho DOH properly disqualified him from participating in the survey. *See* 42 C.F.R. § 488.735(b). The disqualification avoided both an actual conflict and the

appearance of conflict.  The resulting surveys were carried out, and the deficiencies were quickly corrected to Idaho DOH's satisfaction.

Approximately, one year later, on September 26, 2016, Idaho DOH initiated a routine Medicare recertification survey of SA-HHH.  Although SA-HHH was unaware of it at the time, Dennis Kelly was the supervisor of the survey team.  Although Mr. Kelly was not *automatically* disqualified by the two-year bar—it had been 27 months since Dennis Kelly had been terminated from SA-HHH—he should have been disqualified under Medicare rules which are very sensitive to conflicts of interest and recognize that terminations under unpleasant circumstances may be the basis for a longer ban.  Moreover, Dennis Kelly's participation as the survey supervisor was inappropriate because he has both familial and financial interests in Horizon Home Health and Hospice ("Horizon"), a direct competitor of SA-HHH in Boise, Idaho. Horizon is a subsidiary of Cornerstone Healthcare, Inc. ("Cornerstone"), which in turn is a subsidiary of The Ensign Group, Inc. ("Ensign").

The Horizon connection is multifaceted.  Dennis Kelly served as an Administrator at Horizon from November 2010 through June 2013.  During this period he was also in the Hospice and Hospice and Palliative Care Resource group within Cornerstone, Horizon's parent.  Mr. Kelly's wife, Sheryl Kelly, is a nurse-practitioner who currently works for Horizon; his son-in-law, Derrel V. Walker, M.D., who is married to Mr. Kelly's step-daughter, is the Associate Medical Director of Horizon; and Derrel's brother, Daniel H. Walker, is the President and CEO of Cornerstone and was previously the Assistant Secretary and Deputy General Counsel for Ensign.[2]

---

[2] Despite Mr. Kelly's status as a former Horizon employee and the existing direct ties of Mr. Kelly's family members to Horizon, survey letters referencing or signed by Mr. Kelly demonstrate that he was recently involved in Idaho DOH surveys of Horizon. Mr. Kelly's

7

There have been other connections between Mr. Kelly and Horizon as well. Finding Home Foundation, Inc. ("Finding Home") is a tax-exempt organization supported by Horizon and Cornerstone. Finding Home's Articles of Incorporation, filed November 7, 2011, lists Mr. Kelly as its Executive Director/President and a member of its Board of Directors. According to his LinkedIn profile, Mr. Kelly was the Executive Director/President of Finding Home from December 2011 until June 2013. Its website lists Mr. Kelly's son-in-law, Derrel Walker, as its Interim President/CEO and Chief Medical Officer, and Daniel Walker as its secretary. Its December 19, 2016 filing with the Idaho Secretary of the State lists Elliot B. McMillan as the secretary, and Derrel Walker as a director. Elliot B. McMillan is also Finding Home's registered agent. Mr. McMillan is the Associate General Counsel of Cornerstone Service Center in Eagle, Idaho, a Cornerstone/Horizon affiliate. Mr. Kelly's YouTube account *currently* includes a marketing video for Finding Home, featuring Derrel Walker standing in front of a large Horizon Home Health & Hospice poster. Perhaps most troubling is another video on Mr. Kelly's YouTube account which is currently online despite Mr. Kelly's public employee status that depicts Mr. Kelly speaking in favor of the Horizon-linked foundation's initiative and wearing a Horizon-branded shirt.

Notwithstanding the myriad conflicts, the survey proceeded under Dennis Kelly's supervision and was completed on October 3, 2016. At the exit conference, the line surveyors (essentially, the fact finders who reported to Dennis Kelly) were complimentary of the care provided by SA-HHH, but said that the ultimate decision about whether to find deficiencies and

---

surveying of Horizon directly violated CMS conflict rules, which require disqualification from the survey of an agency in which the surveyor has a financial interest or an ownership interest in the HHA to be surveyed, or in which the surveyor has a family member who has a relationship with the HHA to be surveyed.. 42 C.F.R. § 488.735(b)(2) and (3).

the severity of any deficiencies was up to their supervisor, Dennis Kelly.  Medicare guidelines

require the survey team's supervisor, in this case Dennis Kelly, to be involved in that ultimate

decision.  *See* CMS State Operations Manual, Chapter 2, Section 2724C[3].

     On October 17, 2016, Dennis Kelly issued his report of the survey findings.  His report

alleged that SA-HHH was out of compliance with three condition-level requirements (*i.e.*,

requirements of an agency to participate in the Medicare program):  organization/administration;

acceptance of patients/plan of care/medical administration; and skilled nursing services.  In a

survey, deficiencies are assigned a level, based on severity and other objective and subjective

factors.  The most severe type of deficiency—a "condition-level" deficiency—is a deficiency

that "substantially limit[s] the provider's . . . capacity to furnish adequate care or which

adversely affect[s] the health and safety of patients."  42 C.F.R. § 488.24(b); 42 C.F.R. §

488.705. All other deficiencies are "standard-level" deficiencies, and cannot be the basis for a

termination.  Thus, in deeming SA-HHH's deficiencies condition-level—as opposed to standard

level—Mr. Kelly was not only making (erroneous) factual determinations, but also weighing

whether the deficiencies "substantially limit" SA-HHH's performance as a home health agency.[4]

     The vast majority of the supporting findings in Mr. Kelly's report were demonstrably

inaccurate, highly repetitive, and focused on technical documentation issues.  There were no

allegations that any patient ever experienced harm as a result of any alleged deficiency and no

---

[3] Available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c02.pdf.

[4] The report did not allege that SA-HHH's practices caused any actual patient harm, i.e., Mr. Kelly did not assert that the alleged deficiencies had an actual "adverse[ ] affect [on] the health and safety of patients."42 C.F.R. § 488.24(b).

allegation that the deficiencies posed immediate jeopardy to patients.[5]  SA-HHH took the survey

findings seriously, filed a plan of correction and proceeded to implement the plan.  On December

6, 2016, the surveyors returned to assess whether SA-HHH had corrected the alleged

deficiencies.

On December 9, 2016, SA-HHH received a letter from Julius Bunch, Manager of CMS's

Seattle Regional Office Division of Certification and Enforcement.  The letter notified SA-HHH

that, based on the survey results, CMS was imposing a $10,000 per day civil monetary penalty,

retroactive to September 26, 2016 and continuing until such time as SA-HHH regained

substantial compliance with the condition-level requirements. This was an extraordinary penalty.

The total amount of the penalty, calculated through April 3, 2017 (the effective date of SA-

HHH's termination), will be $1,820,000. CMS imposed a total of $2.2 million of penalties on

twenty-nine different agencies in *all of 2016*.[6]  This outrageous sanction was in all likelihood

recommended to CMS by Dennis Kelly.[7]

---

[5] Immediate jeopardy means a situation in which the provider's noncompliance with one or more
requirements of participation has caused, or is likely to cause serious injury, harm, impairment,
or death to a patient(s).  42 C.F.R. § 488.805.

[6] Home Health Line, *Civil Monetary Penalties, Immediate Jeopardy Situations Drop For
Agencies In 2016*, available at:
http://homehealthline.decisionhealth.com/Articles/Detail.aspx?id=523880

[7] *See* CMS State Operations Manual, Chapter 10, Survey and Enforcement Process for Home
Health Agencies, 10000.1 ("Alternative sanctions are recommended by the SA [state agency]
and the CMS RO [regional office] reviews the recommendation to ensure that it is supported by
the SA findings."); 10010.2 - General Provisions ("Survey agencies should make a
recommendation to the RO on which sanction(s) may be effective in prompting the HHA to
return to compliance. The RO considers the SA's recommendations and makes a determination
to agree with or impose a different sanction(s) for the HHA.")

On December 13, 2016, Dennis Kelly wrote a letter to SA-HHH stating that two of the three originally-cited condition-level deficiencies (acceptance of patients/plan of care/medical administration and skilled nursing services) had not been corrected.  As in his previous report, Mr. Kelly's December 13 report was based on findings that were demonstrably inaccurate, highly repetitive and focused on technical documentation issues with no allegation whatsoever that any patient experienced harm.  Again, no immediate jeopardy findings were made.

In light of the gravity of the December 9 and December 13 communications, SA-HHH now marshaled all available resources to develop a plan of correction, submitted on December 28, 2016, and to implement that plan.  Frontier sent its key management team to Boise, and also retained The Corridor Group (a home health and hospice consulting firm headquartered in Overland Park, Kansas) ("Corridor") to assist in the correction effort.  Corridor staffed the correction effort with an experienced interim agency administrator and a compliance nurse who specializes in survey recovery.  In addition, SA-HHH retained another contractor to assist with field observation visits and staff training.

At Corridor's recommendation, SA-HHH limited nursing admissions to give the agency's nurses sufficient time to fully participate in the educational and training aspects of the plan of correction, including 1:1 education and field observation visits.  (This limitation resulted in a decline of home health patients from about 210 to 147, and a commensurate loss in revenue.)

On February 6, 2017, SA-HHH filed a 123-page appeal of CMS's $10,000-per-day civil monetary penalty, challenging every single alleged finding in the October 7, 2016 and December 13, 2016 survey reports.  That appeal is currently pending before an Administrative Law Judge.

On February 21, 2017, Idaho DOH surveyors returned to SA-HHH to assess its compliance with the plan of correction. The surveyors remained on-site for five days, clearly

having been directed to not merely carry out a revisit to assess compliance with the plan of

correction directed at the two pending deficiencies, but to conduct a full recertification survey,

like the one initiated on September 26, 2016.  Conducting a recertification survey in lieu of a

revisit survey is highly unusual. The surveyors focused on new areas of inquiry rather than the

prior survey findings that led to the condition-level deficiencies and the plans of correction.

On February 27, 2017, the surveyors held an exit conference citing issues found during

the survey.  Again, in no case did they allege that any patient experienced harm as a result of

these issues.  SA-HHH expressed adamant disagreement with the findings.  The surveyors told

SA-HHH that it was permitted to submit additional information, within 48 hours, to contest the

findings.  On March 1, 2017, SA-HHH did just that, providing hundreds of pages of additional

information and documentation refuting nearly all of the findings.

### Despite His Prior Employment by and Abrupt Dismissal by SA-HHH, and Despite His Prior Employment by and Familial Connections to SA-HHH's Direct Competitor, Dennis Kelly Exercises His Conflicted Judgment to Conclude That SA-HHH Is Not Medicare-Compliant.

On March 10, 2017, Dennis Kelly sent another letter and report to SA-HHH.  The report

largely ignored the extensive information and documentation provided by SA-HHH to refute the

alleged deficiencies, and cited the same three condition-level deficiencies as in his original letter

of October 17, 2016.  There were no allegations that any patients were actually harmed.  There

also was no allegation that the deficiencies posed immediate jeopardy to patients, which means

that there was no finding that the deficiencies were likely to cause serious harm to any patients.

While SA-HHH disagreed with the findings in the October 17, 2016 and December 13, 2016

reports—many of which were demonstrably false—the misstatements in the March 10, 2017

report were particularly egregious in light of the refutations previously provided on March 1,

which were based on SA-HHH's own investigation appear to have been ignored by Kelly.  The

March 10 report's many blatant factual inaccuracies strongly suggest that Mr. Kelly and the

surveyors did not even bother to read the March 1 refutations.

Indeed, SA-HHH's retained expert has evaluated the March 10 report and concluded that

"the citation of these three condition level deficiencies [in the report] were not justified by the

facts alleged and should not have been cited at all," and that "[t]here are no findings in the

Report that rise to the level of a condition level deficiency." Declaration of Kathleen Peterson-

Sgro, dated March 27, 2017, ¶¶ 11, 13.

By way of illustrative example, the inaccuracies in the March 10 report included the

following:

- The report alleged that SA-HHH delayed in its provision of nursing services to Patient #9.[8]  However, **no nursing services had been ordered for Patient #9 and the patient's daughter, herself a nurse, signed a sworn affidavit attesting to that fact.**

- The report alleged that SA-HHH did not provide social work services to Patient #7 in a timely manner. However, **the physician order specifically states that the frequency for social work services was to be one visit within one month.  SA-HHH's social worker visited Patient #7 within eight days of the order, clearly meeting the timing that the physician had ordered.**

- The report alleged that SA-HHH did not provide wound care as ordered for Patient #3. However, **there were supplemental orders in the patient's file that changed the original wound care orders. SA-HHH's clinicians provided care in accordance with the operative supplemental orders.**

- The report alleged that SA-HHH failed to include Patient #3's walker on his plan of care, but **the walker is referenced in the patient's plan of care.**

- The report alleged that Patient #8's plan of care failed to include her oxygen concentrator, but **Patient #8 did not use an oxygen concentrator.**

The March 10 report also cited technical issues with SA-HHH's documentation, but

which posed no potential for patient harm.  For example:

---

[8] The report anonymized patients, and referred to them by number.  An addendum to the report identified the patients by name.

- The report alleged that SA-HHH failed to include Patient #3's oxygen concentrator on his plan of care, but the patient's medication list stated that the patient was on oxygen via nasal cannula. Since the nasal cannula is the tubing delivery system that is used with the concentrator, **by listing the nasal cannula and the oxygen, it is clear that an oxygen concentrator was being used.**

- The report alleged that Patient #12's plan of care failed to list her nebulizer, but **the plan of care stated ipratroprium-albuterol "by nebulization route," making it clear that the patient was using a nebulizer.**

Furthermore, one of the condition-level citations is clearly contrary to CMS guidance. The Idaho DOH found SA-HHH out of compliance with 42 CFR §484.14, (Organization, Services, and Administration) but cited only one supporting "G tag" (an abbreviated identifier used by CMS to link deficiencies to regulatory requirements) to substantiate the condition-level finding. However, CMS guidance instructs surveyors to consider citation of 42 CFR §484.14 at the condition-level only when at least three supporting G tags are cited. DOH disregarded this guidance. Moreover, the Idaho DOH made overly general and unsubstantiated statements to justify even the single G tag that it cited. Instead of pointing to any specific noncompliant or deficient action or behavior, the Idaho DOH concluded that the agency's governing body failed to provide sufficient administrative oversight and management for the effective operation of the agency merely by virtue of the fact that the Idaho DOH determined that SA-HHH was out of compliance with the Medicare rules, which SA-HHH vigorously disputes. In other words, SA-HHH was deficient with respect to this condition solely because Idaho DOH asserted the other two deficiencies. This sort of ipso facto, Catch 22 reasoning is yet another example of the type of tortured logic that make up many of the findings and indicate a biased survey.

SA-HHH made several attempts to communicate directly with CMS, to explain the gravity of the errors in the March 10 report, and to express its concerns with the manner in which the surveys were conducted. SA-HHH has yet to be provided an opportunity to be heard.

14

On March 13, 2017, the Hospital's legal counsel, Kathleen Drummy, emailed Patrick Thrift, the CMS Executive Regional Manager, to request an opportunity to discuss the survey findings with CMS.

On March 14, 2017, Karen W. Roe, RN, MHA, Nurse Consultant, Division of Survey, Certification & Enforcement, CMS, responded, stating that all correspondence should be directed to Aaron Brown, Assistant Regional Counsel, Office of the General Counsel, HHS, since an appeal (pertaining to the $10,000-per-day penalty) had already been filed by SA-HHH.

On March 15, 2017, Ms. Drummy emailed Ms. Roe to clarify that the request for a conference call with CMS was not in regard to the civil monetary penalties that are pending appeal, but rather the request for a call was related to the March 10 findings.

On March 16, 2017, SA-HHH's outside counsel, along with Ms. Drummy, called Mr. Brown and asked for an audience with CMS to explain the circumstances surrounding the surveys and, particularly, the issues with the March 10 findings.

On March 17, 2017, SA-HHH's outside counsel and Ms. Drummy emailed Mr. Brown and Ms. Roe again requesting an opportunity to discuss the March 10 findings with CMS. Ms. Drummy also left a message for Mr. Chickering.  Mr. Brown responded that "opportunity to resolve the matter still exists" but did not provide a date or time certain where SA-HHH could communicate its concerns to CMS. Ms. Roe responded stating that she would discuss the matter with Mr. Bunch and get back in touch "early next week."  Mr. Chickering never responded at all.

Meanwhile on March 17, 2017, on the basis of the March 10 report, CMS informed SA-HHH that it was terminating SA-HHH's Medicare provider agreement, effective April 3, 2017.

On March 21, 2017, Mr. Brown wrote SA-HHH's outside counsel and Ms. Drummy stating, "After reviewing the 2567 [March 10 report] and supporting information on file, CMS has decided to proceed with its termination action against SA-HHH."

On March 22, 2017, SA-HHH's outside counsel and Ms. Drummy once again emailed Mr. Brown, requesting a phone call with CMS, but did not hear back.  On March 24, 2017, SA-HHH's outside counsel wrote a letter to Mr. Bunch, explaining that CMS had refused to hear SA-HHH, and noting there were serious problems with the March 10 report and the fairness of the underlying survey, based on Mr. Kelly's bias.

Later on March 24, 2017, SA-HHH appealed CMS's determination, and requested an expedited pre-termination hearing before an ALJ. *See* 42 C.F.R. § 498.40.

On March 27, 2017, Mr. Brown finally agreed to speak to SA-HHH's outside counsel by telephone that afternoon.  On the call, SA-HHH's outside counsel provided further details about Dennis Kelly's conflicts and requested an opportunity to demonstrate to CMS that the survey findings were erroneous.  Mr. Brown did not indicate that such an opportunity would be forthcoming.

As of this writing, Idaho DOH has not provided notice of any Idaho licensing violations based on the resurvey results and Idaho DOH indicated to SA-HHH that it is not issuing any such findings or taking any action as to SA-HHH.

## ARGUMENT

SA-HHH is entitled to preliminary relief.  If the CMS termination is not stayed, SA-HHH will suffer irreparable harm when its business is destroyed as a result of the termination.  SA-HHH will also likely prevail in showing that it was deprived of due process by a survey conducted by a biased former employee who was hopelessly conflicted when acting as the

survey's decision-maker. The equities and public interest weigh in favor of assuring that SA-HHH is provided with a fair pre-termination adjudication by an unbiased Administrative Law Judge, and in the meanwhile be permitted to continue to serve the community it has served so well for the past 40 years.

## I.     Standard.

A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (*quoting Pursuing America's Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The last two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## II.     SA-HHH is Entitled to a TRO and a Preliminary Injunction.

### A. Absent an injunction, SA-HHH's business will be destroyed.

If termination of SA-HHH's home health agency is not stayed, it will likely shut down and cease all operations. Where "injury to plaintiffs is 'admittedly economic,' [but] there is 'no adequate compensatory or other corrective relief' that can be provided at a later date, [this] tip[s] the balance in favor of injunctive relief" and constitutes irreparable injury. *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (quoting *Hoffmann–Laroche Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978)). It also goes without saying that in addition to the economic harm SA-HHH will suffer, its vulnerable patients will be forced to adjust to new caregivers and its employees will become unemployed.

A threat to the "continued viability" of a business constitutes irreparable harm. *Collagenex Phrmaceuticals, Inc. v. Thompson*, No. CIV.A. 03-1405(RMC), 2003 WL 21697344,

at *10 (D.D.C. Aug. 26, 2003) (*order dissolved on other grounds* at 2005 WL 256561 (D.D.C. Jan. 19, 2005).) That is, "where the loss threatens the very existence of the movant's business," the harm is irreparable. *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (discussing possibility of bankruptcy in irreparable harm analysis). Indeed, even the "destruction [of a business] in its current form" amounts to irreparable harm. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

Here, SA-HHH will be destroyed absent an injunction. Approximately 93% of SA-HHH's home health revenues, and 69% of overall revenues, come from the Medicare program SA-HHH's balance sheet, as of month-end February 2017, reflects that its assets exceed its liabilities by $35,755. *See Arriva Med. LLC v. United States Dep't of Health & Human Servs.*, No. CV 16-2521-JEB), 2017 WL 943904, at *8 (D.D.C. Mar. 9, 2017) (discussing review of balance sheet for purposes of assessing viability of business). Declaration of Bennett J. Bernblum, dated March 27, 2017 ("Bernblum Decl.") ¶ 5.

Liabilities are about to dwarf assets. Because SA-HHH already has a reduced patient count—a result of quixotically attempting to respond to the Idaho DOH's surveys headed by Dennis Kelly—it is rapidly being drained of assets. (As noted, *supra*, SA-HHH reduced its home health patient count from about 210 to 147, as part of its implementation of its plan of correction.) As of this writing, SA-HHH's home-health patient census is about 137. Current estimates indicate that in the month of March 2017, SA-HHH will experience a gross loss of $119,874. Bernblum Decl. ¶ 7 & Ex. C. Assuming CMS's termination goes into effect on April 3, 2017 (and SA-HHH hopes it does not and that CMS will be enjoined from terminating the

agency), SA-HHH will be unable to admit additional Medicare patients and will have thirty days to reduce its existing Medicare-funded home-health patient count to zero.

SA-HHH estimates that as it reduces its patient count (and even accounting for the expenses it will save by having to serve fewer patients) in April and early May 2017, SA-HHH will have gross losses of approximately $86,561 and $172,526, respectively, and it will have to shut down operations promptly. Bernblum Decl. Ex. C. Again, these projected losses are calculated by removing Medicare home-health payments from SA-HHH's income stream *and* adding back in SA-HHH's savings—from reduced staff, reduced third-party nursing contractor costs and reduced spending on medical supplies—that it will realize from a reduced Medicare patient count. Bernblum Decl. ¶ 7.

Of course, the situation will be far worse than these projected losses. In reality, the remaining small sources of SA-HHH's business—Medicaid, visits covered by commercial insurance or paid out of pocket, and hospice patients—will also dry up. Bernblum Decl. ¶ 9. Patients do not patronize, and doctors do not refer to, a home health agency whose provider agreement has been terminated by Medicare. *Id.*

Thus, even putting aside the fact that the reputational damage caused by being terminated from Medicare *by itself* amounts to irreparable harm—*see Jones v. District of Columbia*, 177 F. Supp.3d 542, 547 (D.D.C. 2016) ("harm to reputation can, in certain circumstances, constitute irreparable injury"); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 7778 (D.D.C. 2001) (loss of trust and goodwill irreparable harm)—the reputational damage makes it a virtual certainty that SA-HHH will not survive if it is terminated from Medicare effective April 3, 2017. Indeed, SA-HHH's competitors are already on notice that SA-HHH's business is ripe for the

19

taking, after a March 21, 2016 article appeared in the *Idaho Statesman* describing the termination notice from CMS.[9]

In short, SA-HHH's home health agency is about to go out of business because of surveys that are flatly wrong and conclusions made by a terminated former employee that is also irreparably conflicted. SA-HHH will cease to exist in a matter of weeks, and it will long be out of business by the time it is afforded an opportunity to defend itself in an administrative hearing.[10]

To add insult to injury, SA-HHH will have been destroyed for no reason. SA-HHH is in substantial compliance with the Medicare program. The vast majority of the "findings" in Dennis Kelly's March 10 report are demonstrably, and have been demonstrated to be, utterly incorrect.

There are many examples of these inaccuracies.

- The report alleged that SA-HHH failed to initiate one patient's services within forty-eight hours of receiving physician referral orders. But the initial "referral" for home health services from that patient's physician was not sufficient to allow SA-HHH to start care because it did not include the patient's diagnosis. When SA-HHH actually received clarification on the physician's order, SA-HHH timely initiated service.
- As to another patient, the report alleged that the patient's plan of care did not provide interventions to address the patient's need for assistance in establishing a living will. However, a nurse did in fact request an order from the physician to provide social work services (for establishing a living will), but the patient was hospitalized before the social work visit took place.

- As to another patient, the report alleged that a patient was at risk for pressure ulcers. But that patient's physical therapist included interventions to avoid development of pressure ulcers. The therapist clearly documented that the plan was to implement interventions to prevent pressure ulcers.

---

[9] Saint Alphonsus home health and hospice agency cited for 'systemic failures', http://www.idahostatesman.com/news/business/article139963643.html
[10] In the normal course, it takes at least several months for an ALJ to resolve an appeal.

These are just a few of the many examples where Dennis Kelly and his team simply got the facts wrong. There was no legitimate reason to terminate SA-HHH. *See* Declaration of Kathleen Peterson-Sgro, dated March 27, 2017.

**B. SA-HHH will likely succeed on the merits.**

SA-HHH will likely succeed in showing that, on the merits, it is entitled to a pre-deprivation hearing. In order to be entitled to a pre-deprivation hearing, a party must satisfy a three-part test:

> ***First***, the private interest that will be affected by the official action; ***second***, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and ***finally***, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (emphases added).

SA-HHH will satisfy this test.

***First***, SA-HHH has a constitutionally-protected property interest in its Medicare provider agreement. It is well recognized that "decertification as a qualified Medicaid [or Medicare] provider implicates a protected property interest and . . . total debarment from government contracting implicates a corporation's protected liberty interest" under the Fifth Amendment. *New Vision Photography Program, Inc. v. D.C.*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014); *see also, e.g., ABA, Inc. v. D.C.*, 40 F. Supp. 3d 153, 166 (D.D.C. 2014) ("termination from the Medicare/Medicaid program or debarment from government contract bidding constitutes a deprivation of a property or a liberty interest protected by due process"); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir.2003) ("formally debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause."); *Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137,

1144-45 (2d Cir. 1986) ("Health care providers have a constitutionally protected property interest in continued participation in the Medicare and Medicaid programs, and thus are entitled to some form of hearing before being finally deprived of that interest."); *Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir. 1986) ("expectation of continued participation in the Medicare program is a property interest protected by the due process clause of the fifth amendment.").

Protection of SA-HHH's continued right to participate in the Medicare program stems from the fact that a corporation, as much as a natural person, "possess[es] a due process liberty interest . . . [that] includes 'the right of the individual to contract [and] to engage in any of the common occupations of life'" *Old Dominion Dairy Prod., Inc. v. Sec'y of Def.*, 631 F.2d 953, 961–62 (D.C. Cir. 1980) (*quoting Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 131 F.3d 353, 361 (3d Cir.1997) (collecting sources).

SA-HHH's participation in the Medicare program is essential to its financial viability and its mission to provide health services to its community, as it has for nearly forty years. To deprive SA-HHH of its participation in the Medicare program is to deprive SA-HHH of the interest that is at the core of its identity as a business.

*Second*, the risk of erroneous deprivation of SA-HHH's Medicare agreement—a deprivation based on the determinations of a terminated former employee who is also laboring under substantial conflicts of interest—is extremely high. "'[A] fair tribunal is a basic requirement of due process.' *In re Murchison*, 349 U.S. 133, 136, (1955). This applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). Thus, an administrative decision-maker "must be impartial for an administrative

22

agency to meet the requirements of due process." *Deretich v. Office of Admin. Hearings, State of Minn.*, 798 F.2d 1147, 1152 (8th Cir. 1986).

Critically, here, these principles dictate that the "*probability of unfairness [is] 'too high to be constitutionally tolerable' where the adjudicator 'has been the target of personal abuse or criticism from the party before him.'*" *Wildberger v. Am. Fed'n of Gov't Employees, AFL-CIO*, 86 F.3d 1188, 1196 (D.C. Cir. 1996) (*quoting Withrow*, 421 U.S. at 47) (emphasis added); *see also Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1170, 1174 (D.C. Cir. 1979) (decision-makers violate the Due Process Clause and must be disqualified when they act with an "unalterably closed mind" and are "unwilling or unable" to rationally consider arguments); CMS State Operations Manual, Chapter 10, Survey and Enforcement Process for Home Health Agencies, Section 10005.3[11] (even if "a surveyor may not have worked for the agency to be surveyed for more than two years," he might have to be disqualified if he "left the HHA [home health agency] under unpleasant circumstances.").

Under these principles, the surveys Dennis Kelly supervised create an unacceptable risk of an erroneous deprivation, thus making the probable value of a hearing before an ALJ extremely high.   Mr. Kelly was terminated by SA-HHH after SA-HHH determined that were substantial questions regarding his performance.   It is highly likely that, given the circumstances, Dennis Kelly harbors ill will toward his former employer. He should never have been assigned to supervise the surveys of the agency from which his employment was terminated. Equally troubling is the fact that Dennis Kelly's wife, his step-daughter's husband, and his step-daughter's husband's brother all have direct financial interests in Horizon, SA-

---

[11] Available at: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c10.pdf.

HHH's direct competitor, where Dennis Kelly himself formerly worked as a manager and which will benefit from SA-HHH's demise. Dennis Kelly's bias and "unalterably closed mind" is well-demonstrated by his apparent refusal to consider the documentation and information submitted on March 1, 2017 that demonstrably contradict the "findings " that are the basis of his March 10 report. Dennis Kelly has recommended termination of SA-HHH. Its termination will directly and undeniably benefit its closest competitor where Mr. Kelly's wife is employed and with which other of his relatives are associated. Dennis Kelly never should have been charged with supervising the surveys of SA-HHH. The surveys and their conclusions are hopelessly tainted and suspect.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (*quoting Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Thus *Mathews* instructs that a procedure is constitutionally acceptable where "the decision whether to discontinue . . . benefits . . . turn[s] . . . upon 'routine, standard, and *unbiased* . . . reports . . . .'" *Mathews*, 424 U.S. at 344 (*quoting Richardson v. Perales*, 402 U.S. 389, 404 (1971) (emphasis added)). That is not the type of process that SA-HHH received here.

But all of this can be sorted out before an Administrative Law Judge. At a hearing, SA-HHH will have the opportunity—its first—to show that it in fact meets the conditions for participation in the Medicare program. SA-HHH is confident that it will make this showing. It simply needs a fair forum.

*Finally*, the government has no legitimate interest in denying SA-HHH due process. Importantly, the agency's patients will not be at risk. The surveys found no instances of patient harm or "immediate jeopardy. Furthermore, the government will incur no additional costs if SA-HHH's termination is stayed pending a hearing before an ALJ. The Medicare payments that the

government will make to SA-HHH while the hearing is pending are payments that the

government would make anyway, to whatever home health agency would serve SA-HHH's

patients if SA-HHH were terminated. *See Ridgeview Manor of Midlands, L.P. v. Leavitt*, No.

3:07 CV 861 JFA, 2007 WL 1068224, at *6 (D.S.C. Mar. 30, 2007) ("No harm will be suffered

by [the government] in the court's issuing a restraining order because the [government] will

likely be paying the same fees for the affected Medicare and Medicaid residents, regardless of

what facility the residents are located.") A stay of the termination would not cause the

government to outlay any additional monies.

 Moreover, there is no administrative burden to the government in affording SA-HHH a

pre-deprivation hearing. *Any* terminated home health agency is entitled to a hearing before an

ALJ. The only difference here is that SA-HHH's hearing would occur *before* it is terminated, to

remedy the process that, under the unique circumstances of this case, was constitutionally flawed

as a result of Dennis Kelly's bias.

 There is not "any harm to the government in permitting the ALJ to reach promptly the

merits of a live controversy rather than forcing him to wait until after plaintiff is financially

dysfunctional . . . . Indeed, an injunction will further the significant public interest both in the

smooth functioning of the administrative process and in protecting the [patients'] interests, as

suggested by the purposes of the Medicare statute." *Int'l Long Term Care, Inc. v. Shalala*, 947 F.

Supp. 15, 20 (D.D.C. 1996) (enjoining Medicare termination pending hearing before ALJ).

Indeed, "both Congress and the Secretary have recognized the potential harm [in cutting off

provider funding] and the compelling public interest in providing timely and uninterrupted health

care funding." *Id.* (quoting *Beverly Enterprises v. Mathews,* 432 F. Supp. 1073, 1079 (D.D.C.

1976) (alterations as in *Int'l Long Term Care*)).

For this reason, numerous courts, like *Int'l Long Term Care*, have enjoined Medicare terminations so that a provider's Medicare qualifications can be fairly evaluated, rather than be put out of business. *See, e.g., Libbie Rehabiliation Ctr., Inc. v. Shalala*, 26 F. Supp. 2d 128, 133 (D.D.C. 1998) (preliminarily enjoining of Medicare termination); *Blossom South, LLC v. Sebelius*, No. 13-CV-6452L, 2013 WL 4679275, at *2 (W.D.N.Y. Aug. 30, 2013) (same); *New Orleans Home for Incurables, Inc. v. Greenstein*, 911 F. Supp. 386, 413 (E.D. La. 2012) (same); *Ridgeview Manor*, 2007 WL 1068224, at *6 (same); *Pathfinder Healthcare, Inc. v. Thompson*, 177 F. Supp. 2d 895, 897 (E.D. Ark. 2001) (same); *Mediplex of Massachusetts, Inc. v. Shalala*, 39 F. Supp. 2d 88, 101 (D. Mass. 1999) (same). An injunction will cause the government no burden, but it will save SA-HHH's business.

SA-HHH will likely prevail in showing that it is entitled to a hearing, and should not be bound by a constitutionally-flawed evaluation adjudicated by a biased decision-maker.

### C. The Equities and the Public Interest Favor an Injunction.

The equities and the public interest favor SA-HHH. As noted in the discussion, *supra*, of the third *Mathews* factor, the government will not be burdened by a hearing before an ALJ and such a hearing will give SA-HHH a fair opportunity to demonstrate that it meets Medicare's qualifications. Moreover, the public will not be harmed by permitting SA-HHH to continue operating. Dennis Kelly's reports did not allege that any patient experienced harm as a result of SA-HHH's practices; SA-HHH was purportedly terminated on the basis of factual inaccuracies and failures to adhere to program technicalities.

More fundamentally, "there is a strong public interest in meticulous compliance with the law by public officials." *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993). SA-HHH assumes that Idaho DOH and CMS had no knowledge of Dennis Kelly's conflicts of

interest; had they known of them, SA-HHH is confident that, pursuant to Medicare principles and those of due process, Idaho DOH and CMS would never have permitted Mr. Kelly to participate in these surveys.  The public has an interest in seeing to it that the Medicare system is implemented and supervised in such a manner "to ensure that the integrity of the survey process is preserved," CMS State Operations Manual, Chapter 10, Survey and Enforcement Process for Home Health Agencies, Section 10005.3.  Here, the survey process was conducted in a manner that causes the survey to be inherently suspect.  Indeed, an expert with vast experience reviewing surveys has examined the surveys here and concluded that the findings are largely unjustified and should never have resulted in a termination notice.  Declaration of Kathleen Peterson-Sgro, dated March 27, 2017, ¶¶ 11, 13.

SA-HHH has served its community for nearly 40 years. Contrary to the specious findings on which CMS based its termination decision, SA-HHH is in compliance with the requirements of the Medicare program.  It is the government—not SA-HHH—that has breached its obligations of fairness and service to the public by relying on such findings and in improperly and unconstitutionally initiating termination of  SA-HHH's Medicare participation.

## CONCLUSION

For the foregoing reasons, SA-HHH's motion for a temporary restraining order and a preliminary injunction should be granted, and the pending termination of SA-HHH's home

health agency Medicare participation should be enjoined until SA-HHH has had a full opportunity to be heard in its pending administrative appeal.

Dated: March 29, 2017                         Respectfully submitted,

                                              By: 

                                              David L. Hall
                                              D.C. Bar Number: 1033996
                                              Dana M. Stepnowsky
                                              D.C. Bar Number: 1004080
                                              WIGGIN AND DANA LLP
                                              1350 I Street, NW
                                              Washington, D.C. 20005
                                              202.800.2470
                                              dhall@wiggin.com

                                              James I. Glasser (*pro hac vice* pending)
                                              WIGGIN AND DANA LLP
                                              One Century Tower
                                              P.O. Box 1832
                                              New Haven, CT 06508-1832
                                              (203) 498-4400
                                              (203) 782-2889 (fax)
                                              jglasser@wiggin.com

                                              *Counsel for Saint Alphonsus*
                                              *Home Health and Hospice, LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SAINT ALPHONSUS HOME HEALTH AND
HOSPICE, LLC,

                   Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES,

and

TOM PRICE,

Secretary of the United States Department of
Health & Human Services,

and

SEEMA VERMA,

Administrator of the Centers for Medicare &
Medicaid Services,

                   Defendants.

Case:

**EXPEDITED**
**CONSIDERATION REQUESTED**

**PRELIMINARY RELIEF (TRO)**
**SOUGHT BY APRIL 3, 2017**

**DECLARATION OF BENNETT J. BERNBLUM**

    1.    My name is Bennett J. Bernblum. I make this declaration in support of Saint

Alphonsus Home Health and Hospice, LLC's ("SA-HHH") motion for a temporary restraining

order and a preliminary injunction.

    2.    I am a member of the board of managers and the Vice President Strategy of

Frontier Home Health and Hospice, LLC, the 50% owner and manager of SA-HHH. I have

personal knowledge of the matters contained herein.

3.      I am thoroughly familiar with the facts contained in the Complaint in the above-entitled action.  The same are true to the best of my knowledge and belief.

4.      I make this declaration to provide additional information about the irreparable harm SA-HHH will suffer if its home health agency Medicare provider agreement is terminated effective April 3, 2017.

5.      Attached hereto as Exhibit A is SA-HHH's latest monthly balance sheet, generated as of month-end February 2017.  As the balance sheet reflects, SA-HHH's assets exceed its liabilities by only $35,755.

6.      Attached hereto as Exhibit B is SA-HHH's income statement, generated as of month-end February 2017.  As the income statement reflects, SA-HHH suffered a gross loss of $130,746 in February 2017.

7.      Attached hereto as Exhibit C is SA-HHH's projected income statement for the months March 2017 through June 2017. This projected income statement assumes that SA-HHH's Medicare provider agreement is terminated effective April 3, 2017.  Because approximately 93% of SA-HHH's home health revenues, and 69% of overall revenues, come from the Medicare program, SA-HHH will experience gross losses each month, as indicated in the projected income statement, if its home health agency Medicare provider agreement is terminated.  SA-HHH will experience these losses even accounting for the reduced staff, reduced third-party nursing contractor costs, and reduced spending on medical supplies that are reflected in the projected income statement.

8.      As the projected income statement and balance sheet reflect, SA-HHH will run out of money and go out of business in a matter of weeks, assuming the April 3, 2017 termination goes into effect.

9.      Indeed, the situation will be far worse than the losses reflected in the projected income statement. It is highly likely that the remaining sources of SA-HHH's business—Medicaid, visits covered by commercial insurance or paid out of pocket, and hospice patients—will also significantly diminish, if not evaporate, in the event of termination.  That is because patients would be strongly disinclined to patronize, and doctors would be strongly disinclined to refer to, an agency whose home health certification has been terminated by Medicare.

10.      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.


Dated: March 27, 2017

Place: Old Lyme, Connecticut


Bennett J. Bernblum

# EXHIBIT A

**Balance Sheet**
**As of 2/28/2017**

**SAINT ALPHONSUS HOME HEALTH & HOSPICE LLC (STA)**

**Assets**

**Cash**

| | | | |
|---|---|---|---|
| 1010-000-00 | CASH | $ 70,430.20 | |
| 1080-000-00 | CASH PETTY | $ 2,445.00 | |
| | **Total Cash:** | | $ 72,875.20 |

**Receivables**

| | | | |
|---|---|---|---|
| 1100-000-00 | A/R MEDICARE | $ 350,103.21 | |
| 1101-000-00 | A/R MEDICARE HOSPICE | $ 226,992.52 | |
| 1102-000-00 | A/R NON-MEDICARE PPS | $ 407,337.44 | |
| 1103-000-00 | A/R MEDICAID | $ 34,984.88 | |
| 1103-600-00 | A/R MEDICAID:HOSPICE | $ 16,430.78 | |
| 1104-000-00 | A/R COMM INS | $ 195,517.38 | |
| 1104-600-00 | A/R COMM INS:HOSPICE | $ 28,776.64 | |
| 1106-000-00 | A/R PATIENT PAY | $ 1,055.00 | |
| 1106-600-00 | A/R PATIENT PAY:HOSPICE | $ 18,491.21 | |
| 1108-000-00 | A/R - HUMANA/UHC | $ 265,731.31 | |
| 1181-000-00 | CONTRA A/R MED HOSP | $-4,884.98 | |
| 1182-000-00 | CONT A/R NON MED PPS | $-37,516.22 | |
| 1183-000-00 | CONTRA A/R MEDICAID | $-14,769.95 | |
| 1184-000-00 | CONTRA A/R COMM INS | $-47,942.75 | |
| 1188-000-00 | CONT A/R HUMAN/UHC | $-119,020.44 | |
| | **Total Receivables:** | | $ 1,321,286.03 |

**Allowance for Bad Debts**

| | | | |
|---|---|---|---|
| 1295-000-00 | ALLOW DOUBT ACCTS | $-184,203.32 | |
| | **Total Allowance for Bad Debts:** | | $-184,203.32 |

**Prepayments and Other Receivables**

| | | | |
|---|---|---|---|
| 1300-000-00 | OTHER RECEIVABLES | $-1,044.81 | |
| 1305-000-00 | REC PASS THRU BILL | $-1,778.03 | |
| 1310-000-00 | PREPAID INSURANCE | $ 1,036.82 | |
| 1330-000-00 | OTHER PREPAID EXP | $ 18,287.81 | |
| | **Total Prepayments and Other Receivables:** | | $ 16,501.79 |

**Equipment**

| | | | |
|---|---|---|---|
| 2100-000-00 | OFFICE EQUIPMENT | $ 28,634.00 | |
| 2110-000-00 | FURNITURE & FIXTURES | $ 74,572.00 | |
| 2115-000-00 | COMPUTER EQUIPMENT | $ 80,783.41 | |
| 2130-900-00 | SOFTWARE:HH | $ 29,600.00 | |
| 2135-000-00 | MEDICAL EQUIPMENT | $ 81,411.00 | |
| | **Total Equipment:** | | $ 295,000.41 |

**Acc Depreciation**

| | | | |
|---|---|---|---|
| 2300-000-00 | ACCUM DEPRECIATION | $-253,997.81 | |
| | **Total Acc Depreciation:** | | $-253,997.81 |
| | **Total Assets:** | | $ 1,267,462.30 |

**Liabilities**

**Accounts Payable and Accrued Expenses**

| | | | |
|---|---|---|---|
| 3000-000-00 | ACCOUNTS PAYABLE | $ 563,113.49 | |
| 3030-000-00 | ACCRUED EXPENSES | $ 138,409.40 | |
| 3040-000-00 | OVERPAYMENTS | $ 10,651.05 | |
| 3045-000-00 | LUPA OVERPAYMENTS | $ 7,199.08 | |
| 3060-000-00 | DEF MEDICARE REV | $ 97,479.83 | |
| 3061-000-00 | NONMEDICARE DEF REV | $ 97,487.82 | |
| 3062-000-00 | DEFERRED REV HUMAN/UHC | $ 27,690.19 | |

**Balance Sheet**
**As of 2/28/2017**

**SAINT ALPHONSUS HOME HEALTH & HOSPICE LLC (STA)**

|  |  |  |  |  |
|---|---|---|---|---|
|  | Total Accounts Payable and Accrued Expenses: |  |  | $ 942,030.86 |
| **Accrued Payroll** |  |  |  |  |
| 3500-000-00 | ACCRUED SALARIES |  | $ 116,794.26 |  |
| 3510-000-00 | ACCRUED PTO |  | $ 138,649.79 |  |
| 3530-000-00 | ACCRUED BONUS |  | $ 5,735.00 |  |
| 3540-000-00 | ACCR 401K COMP MATCH |  | $ 1,791.75 |  |
|  | Total Accrued Payroll: |  |  | $ 262,970.80 |
| **Accrued Payroll Taxes** |  |  |  |  |
| 3600-000-00 | FED INC TAX W/H |  | $ 10,698.82 |  |
| 3610-000-00 | ST INC TAX W/H |  | $ 4,910.00 |  |
| 3620-000-00 | FICA WITHHOLDING |  | $ 8,395.92 |  |
|  | Total Accrued Payroll Taxes: |  |  | $ 24,004.74 |
| **Payroll Withholding** |  |  |  |  |
| 3700-000-00 | BENEFIT WITHHOLDING |  | $-3,003.82 |  |
| 3710-000-00 | 401(K) W/H |  | $ 5,030.25 |  |
| 3720-000-00 | WAGE ATTACH W/H |  | $-0.87 |  |
| 3750-000-00 | 401K LOAN REPAY W/H |  | $ 674.51 |  |
|  | Total Payroll Withholding: |  |  | $ 2,700.07 |
|  | Total Liabilities: |  |  | $ 1,231,706.47 |
| **Equity** |  |  |  |  |
| **Retained Earnings** |  |  |  |  |
| 4000-000-00 | RETAINED EARNINGS |  | $ 5,658,949.54 |  |
| 4000-000-00 | Retained Earnings-Current Year |  | $-257,521.71 |  |
|  | Total Retained Earnings: |  |  | $ 5,401,427.83 |
| **Stock** |  |  |  |  |
| 4100-000-00 | COMMON STOCK AT PAR |  | $ 59,328.00 |  |
| 4300-000-00 | DIST OF EARNINGS |  | $-5,425,000.00 |  |
|  | Total Stock: |  |  | $-5,365,672.00 |
|  | Total Equity: |  |  | $ 35,755.83 |
|  | Total Liabilities & Equity: |  |  | $ 1,267,462.30 |

# EXHIBIT B

Saint Alphonsus Home Health and Hospice

|  | 2017 Feb Actual |
|---|---|
| TOTAL REVENUE | 360,530 |
| **Direct Expenses:** | |
| TOTAL DIRECT COMPENSATION | 161,273 |
| TOTAL CHARGES ON COMP | 21,726 |
| TOTAL DIRECT EMPLOYEE BENEFITS | 21,911 |
| TOTAL CONTRACTORS | 26,886 |
| TOTAL OTHER DIRECT | 28,542 |
| Total Direct Expenses | 260,338 |
| DIRECT MARGIN | 100,192 |
| **Administrative Expenses:** | |
| TOTAL STAFF COMPENSATION | 83,782 |
| TOTAL CHARGES ON COMPENSATION | 7,521 |
| TOTAL STAFF EMPLOYEES BENEFITS | 3,267 |
| TOTAL OTHER EMPLOYEE EXPENSES | 10,515 |
| TOTAL OUTSIDE SERVICES | 99,066 |
| TOTAL FACILITIES | 14,462 |
| TOTAL INSURANCE | 1,153 |
| TOTAL OFFICE SUPPLIES AND EXPENSE | 7,072 |
| TOTAL ADVERTISING AND P/R | 993 |
| BAD DEBT EXPENSE | 3,107 |
| BANK CHARGES | |
| Total Administrative Expenses | 230,938 |
| GROSS PROFIT | (130,746) |

# EXHIBIT C

Saint Alphonsus Home Health and Hospice
2017 Pro Forma

|  | Mar | Apr | May | Jun |
|---|---|---|---|---|
| TOTAL REVENUE | 360,530 | 312,428 | 174,579 | 169,929 |
| **Direct Expenses:** | | | | |
| TOTAL DIRECT COMPENSATION | 161,273 | 136,917 | 122,676 | 70,905 |
| TOTAL CHARGES ON COMP | 21,726 | 15,294 | 8,546 | 8,318 |
| TOTAL DIRECT EMPLOYEE BENEFITS | 21,911 | 17,677 | 6,686 | 6,654 |
| TOTAL CONTRACTORS | 16,000 | 16,000 | - | - |
| TOTAL OTHER DIRECT | 28,542 | 32,851 | 24,674 | 24,674 |
| Total Direct Expenses | 249,452 | 218,739 | 162,583 | 110,551 |
| DIRECT MARGIN | 111,078 | 93,689 | 11,996 | 59,377 |
| **Administrative Expenses:** | | | | |
| TOTAL STAFF COMPENSATION | 83,782 | 87,204 | 93,563 | 43,563 |
| TOTAL CHARGES ON COMPENSATION | 7,521 | 7,825 | 8,311 | 4,486 |
| TOTAL STAFF EMPLOYEES BENEFITS | 3,267 | 6,015 | 3,440 | 3,440 |
| TOTAL OTHER EMPLOYEE EXPENSES | 10,515 | 5,856 | 5,856 | 5,856 |
| TOTAL OUTSIDE SERVICES | 99,066 | 46,286 | 46,286 | 46,286 |
| TOTAL FACILITIES | 14,462 | 14,475 | 14,475 | 14,475 |
| TOTAL INSURANCE | 1,153 | 1,133 | 1,133 | 1,133 |
| TOTAL OFFICE SUPPLIES AND EXPENSE | 7,072 | 7,342 | 7,342 | 7,342 |
| TOTAL ADVERTISING AND P/R | 1,007 | 1,007 | 1,007 | 1,007 |
| BAD DEBT EXPENSE | 3,107 | 3,107 | 3,107 | 3,107 |
| BANK CHARGES | | | | |
| Total Administrative Expenses | 230,952 | 180,250 | 184,522 | 130,697 |
| GROSS PROFIT | (119,874) | (86,561) | (172,526) | (71,320) |

Assumptions: April 3, 2017 termination of Medicare
Provider Agreement and lost revenue for Medicare
patients and Medicare Advantage patients

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAINT ALPHONSUS HOME HEALTH AND
HOSPICE, L.L.C.,

                    Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES,

and

TOM PRICE,

Secretary of the United States Department of
Health & Human Services,

and

SEEMA VERMA,

Administrator of the Centers for Medicare &
Medicaid Services,

                    Defendants.

Case:

**EXPEDITED
CONSIDERATION REQUESTED**

**PRELIMINARY RELIEF (TRO)
SOUGHT BY APRIL 3, 2017**

## DECLARATION OF KATHLEEN PETERSON-SGRO, DNP, RN

1.      My name is Kathleen Peterson-Sgro. I make this declaration in support of St. Alphonsus Home Health and Hospice, L.L.C.'s ("SA-HHH's") motion for a temporary restraining order and a preliminary injunction.

2.      I am a consultant with Simione Healthcare Consultants, a national organization dedicated to providing expert assistance to home health care and hospice organizations.

3.      I have a Doctorate of Nursing Practice from Rush University, in Chicago, Illinois, a Master in Business Administration from the University of Illinois at Springfield, Illinois, and I

am a graduate of St. John's Hospital College of Nursing in Springfield, Illinois. I received a

Bachelor of Science in Health Care from St. Frances College in Joliet, Illinois, and I am a

registered nurse with a background in medical-surgical, long term care, and oncology nursing.

4.       I am the President and Administrator of the Alterna-Care Home Health System,

which I co-founded in 1990. Alterna-Care is the largest and most comprehensive free-standing

home health organization in central Illinois.

5.       I have published articles on nursing and care in *Health Nursing Magazine*, a

nationally recognized nursing journal (2007); and *Caring Magazine*, the leading publication of

the home health industry (2008). I co-authored a chapter in the textbook, *Doctor of Nursing*

*Practice* (2010).

6.       From 2009-2011, I served as a home health and hospice surveyor for the

Accreditation Commission for Health Care ("ACHC"). The ACHC is approved by the Centers

for Medicare & Medicaid Services ("CMS") as an accreditation program. Section 1865(a) of the

Social Security Act permits home health agencies that are accredited by a CMS-approved

accreditation program to be "deemed" to meet Medicare conditions of participation (CoP). In

my role as an ACHC surveyor, I determined whether home health agencies were compliant with

the Medicare conditions of participation.

7.       I am knowledgeable of the professional standards applicable to the provision of

home-health medical, nursing and related services prevailing in the United States. I am also

knowledgeable of the Medicare program's requirements for home health agencies.

8.       I was retained by SA-HHH to evaluate the report of deficiencies dated March 10,

2017 that was issued to SA-HHH (the "Report") for a revisit survey conducted from February

21, 2017 to February 27, 2017 by the Idaho Department of Health and Welfare. In the Medicare

program, this type of Report is referred to as a "2567" (after Form CMS-2567, on which it is generated). A 2567 is typically generated each time a home health agency is surveyed (that is, evaluated) for purposes of assessing its compliance with Medicare program requirements. In the course of my career, I have reviewed many 2567s, and am familiar with the standards and practices that govern their creation, as well as the standards and practices applicable to the underlying surveys.

9.     I reviewed the March 10, 2017 Report and the appeal letter that SA-HHH filed with United States Department of Health and Human Services Departmental Appeals Board on March 24, 2017.

10.    The March 10 Report cited SA-HHH for three condition-level deficiencies:  (1) 42 C.F.R. § 484.14 (G122—Organization, Services and Administration); (2) 42 C.F.R. § 484.18 (G156—Acceptance of Patients, Plan of Care and Medical Supervision); and (3) 42 C.F.R. § 484.30 (G168—Skilled Nursing Services).

11.    In my opinion, the citation of these three condition level deficiencies were not justified by the facts alleged and should not have been cited at all.

12.    A condition level deficiency is to be cited only "where the deficiencies are of such character as to substantially limit the provider's or supplier's capacity to furnish adequate care or which adversely affect the health and safety of patients." 42 C.F.R. § 488.705; 42 C.F.R. §488.24; State Operations Manual, Chapter 10—Survey and Enforcement Process for Home Health Agencies, §10001—Definitions and Acronyms.

13.    There are no findings in the Report that rise to the level of a condition level deficiency.

14.    In fact, the allegations in the Report are most certainly not the type of allegations that would justify termination of a home health agency.

15.    I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

_Kathleen Soro, DNP_
Signature

_KATHLEEN SORO_
Name

_3/27/2017_
Date

_SPRINGFIELD, IL_
City, State

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SAINT ALPHONSUS HOME HEALTH AND
HOSPICE, LLC,

       Plaintiff,

  v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES,

and

TOM PRICE,
Secretary of the United States Department of
Health & Human Services,

and

SEEMA VERMA,
Administrator of the Centers for Medicare &
Medicaid Services,

       Defendants.

---

### [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION
### FOR EMERGENCY REQUEST FOR A TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

Saint Alphonsus Home Health and Hospice, LLC's ("SA-HHH") motion for a temporary

restraining order and preliminary injunction is GRANTED.

The Court orders that Defendants Department of Health & Human Services ("HHS"),

Tom Price (the HHS Secretary) and Seema Verma (the administrator of the Centers for Medicare

and Medicaid Services) are ENJOINED from terminating SA-HHH, on the bases set forth in the

termination notice purporting to be effective April 3, 2017 and on the bases of any

determinations underlying such notice, from the Medicare home health program pending

resolution of SA-HHH's pending appeal of such notice before an Administrative Law Judge.


Dated: _____                    _____
                                            UNITED STATES DISTRICT JUDGE